# The People on the relation of the Board of Park Commissioners of Detroit v. The Common Council of Detroit.

*Parks:* *Statute construed.* Under the legislation relative to a public park for the city of Detroit (*Laws 1871, Vol. 2, p. 1322 ; Laws 1873, Vol. 2, p. 100*) all action of the commissioners up to the time when an issue of bonds is ordered by the common council is provisional only, and no debt is contracted by the city or legal obligation assumed until affirmative action is taken by that body upon the report of the commissioners.

*Mandamus :* *Common council :* *Ministerial duty.* The performance of a mere ministerial duty may as well be enforced when it rests upon an aggregate body like the common council, as when incumbent upon a single officer.

*Municipal corporations :* *State control :* *Legislative authority.* The compulsory authority of the legislature over municipal corporations considered, and held that as regards matters of general concern, and duties which the people of the several localities owe to the commonwealth at large, the control of the state is complete, and no discretionary authority is vested in such corporations.

*Municipal corporations :* *Two-fold character ;* *Local interests ;* *State control.* But such corporations, though made use of in state government and in that character subject to state control, have other objects and purposes peculiarly local in which the state at large, except in conferring the power and regulating its exercise, is legally no more concerned than it is in the individual and pri-

vate concerns of its several citizens; and it is from the standpoint not of state interest, but of local interest, that the necessity of incorporating cities and villages most distinctly appears.

*Property rights: Matters of exclusively local concern.* And as regards property rights, and matters of exclusively local concern, the state has no right to interfere and control by compulsory legislation the action of municipal corporations.

*Parks: Fountains: Local self-government.* The people of other parts of the state, through their representatives, have no more authority to dictate to the city of Detroit what fountains shall be erected at its expense for the use of its citizens, or at what cost it shall purchase, and how it shall improve and embellish a park or boulevard for the recreation and enjoyment of its citizens, than have the rest of the community to dictate to an individual what he shall eat, drink, or wear.

*Motive: Benefits: State interference with local self-government.* The motive of such interference, or considerations of the benefits to be derived in the special instance, have no bearing upon the question, which is one of the invasion of the rights of others.

*Legislative power: Citizens' meetings: Parks.* It was within the legislative power to take away as it did from a citizens' meeting, where it was formerly located under the act of 1871, the right to decide for the city upon the purchase of a public park, and to lodge it with some other proper agent or representative of the local community.

*Representatives of a city: State agents: Park commissioners.* But the state had no authority to confer such functions upon its own agents, nor by legislative amendment enlarging their powers, upon these park commissioners, who were originally state appointees, and have become representatives of the city only to the extent that their authority was recognized under the original statute by the representatives of the city, which conferred upon them no such power.

*Common council.* Whether or not this power could be vested by the legislature in any other representative of the city than the common council :—*Quære ?*—CAMPBELL, J., holding the negative.

*Representatives: Particular person: Specified purpose.* A representative is one chosen by a principal to exercise for him a power, or perform for him a trust, and implies as much a particular purpose as a particular person; and a person authorized by a city to represent it for one purpose, cannot be clothed by the state with authority in purely local matters to represent the city for another and different purpose for which it had no power to appoint him originally.

*Advisory power: Final determination: Statutes construed.* The power to advise the city to buy the property selected for a park, if its citizens shall choose to do so and shall voluntarily incur the cost, is not the same, in degree or in nature, as the power to bind the city irrevocably to a purchase which its citizens may protest against, and to compel them to incur a heavy debt for an object they may not desire; and so great is the difference between the authority conferred upon the commissioners by the original act, and that by the amended one.

*Mandamus: Parks: Common council: Bonds.* Application for *mandamus* to compel the common council to order the issuing of bonds to purchase lands for a park contracted for by the commissioners, is denied.

*Heard October 21 and 22. Decided October 28.*

Application for *mandamus*.

*C. I. Walker, G. V. N. Lothrop, Theodore Romeyn* and
*J. Logan Chipman,* for the relators.

*F. A. Baker, Henry M. Cheever, William A. Moore* and
*Ashley Pond,* for the respondents.

COOLEY, J.

The act relating to a public park for the city of Detroit,
approved April 15, 1871 (*Laws 1871, Vol. 2, p. 1322*),
created a board of park commissioners, with power and
authority to adopt plans for a public park, or boulevard, or
both, with the necessary avenues or approaches thereto, for
the use of the city of Detroit, and for those purposes to
select the needful lands either wholly or in part, within the
city or any of the adjacent townships, and to make condi-
tional contracts therefor subject to ratification by the com-
mon council and a vote of a citizens' meeting.    All pur-
chases for the purpose were limited to five hundred acres,
at a cost of not more than two hundred thousand dollars.
The common council was authorized to issue bonds to make
the necessary purchases, after their proposition for the pur-
pose had been submitted to and approved by a citizens'
meeting, and the commissioners were authorized to institute
proceedings in the circuit court for the county of Wayne
for the appropriation of lands which they could not acquire
by purchase.    After the lands were acquired, the commis-
sioners were to cause estimates to be made and laid before
the council annually, of expenditures proposed for the
improvement, embellishment and keeping of the grounds,
and the common council were required to provide for such
expenditure by an issue and sale of bonds, not exceeding
fifty thousand dollars in any one year, as it might think
proper, but subject to approval by a citizens' meeting.    The
act named six prominent citizens of Detroit as the first
members of the commission, who were to be divided by lot

into three classes, the first to hold office for one year, the second for two, and the third for three years, and their successors were to be appointed by the common council.

The commissioners were duly organized into a board as provided by the act, and proceeded in the discharge of their duties. ·Some question having been made regarding the power of the legislature to appoint them, the attorney general instituted proceedings by *quo warranto* against one of their number, to determine this question, and it appearing that the official authority of the commissioners had been fully recognized by the common council, in whom, with the mayor, was vested the general power to appoint, this court held that though the appointment could not originally have rightfully been made by the state, yet that the recognition of their official character by the appointing power without objection or dissent, was sufficient to constitute them city officers.—*Attorney General v. Lothrop, 24 Mich., 235.* Subsequent to this the common council filled two vacancies occurring in the board, by confirmation of the mayor's nominations.

We are informed by the petition in this case that some time in 1871 the park commissioners selected what they deemed the most eligible site for a park, and entered into conditional contracts for the same on favorable terms; that they reported their action to the common council, and that body ordered the proposition for the issue of the bonds necessary to complete the purchase, to be submitted to a citizens' meeting. Two successive meetings were held to consider it, but there was so much of noise, confusion and violence at these meetings that no intelligent discussion could be had, and no result was reached.

By an act approved March 14, 1873 (*Laws 1873, Vol. 2, p. 100*), it is supposed much larger powers have been conferred upon the board. They are permitted to " acquire by purchase" lands not exceeding in cost three hundred thousand dollars, and the act declares that whenever the board

shall locate the site of a park or boulevard, or both, and shall make such location known to the common council, and lay before that body a statement in writing of the cost of the land acquired by the purchase, and an estimate in writing of the cost of the lands necessary to be acquired which the board has been unable to purchase, the common council shall provide money for such purposes, not exceeding the amount limited by the act, by the issue and sale of city bonds. It will be seen from this that the board of park commissioners are to have discretionary and unrestricted power in the location of the park or boulevard, or both, and in determining the amount of debt the city shall incur for the purpose, within the limits prescribed by the act, and the only discretionary authority left with the council is, that the act authorizes that body to determine the rate of interest on the bonds, not exceeding seven per cent., the sums in which they shall be issued, and the time when they shall be payable, which shall be not less than thirty, nor more than fifty years.

Acting under this legislation, the board reported to the common council on August 13, 1873, that they had located the site of a public park on Jefferson avenue, three miles from the city hall, containing about four hundred and fifty acres; that they had purchased three hundred and seventy-five acres of the four hundred and fifty selected, at a cost of two hundred and twenty-nine thousand one hundred and forty dollars and fourteen cents, and estimated the cost of acquiring the remainder at about seventy thousand dollars, and they requested that the common council would authorize the issue of bonds to an amount not exceeding three hundred thousand dollars, to pay the cost. It is not necessary to state in detail the proceedings of the council on this report; it is sufficient to say that a resolution that city bonds to the amount of three hundred thousand dollars, payable in thirty years, with interest at seven per centum, has failed to receive the approval of that body.

And the board of park commissioners now apply to this
court for the writ of *mandamus*, directed to the common
council, commanding that body to provide money to the
amount of three hundred thousand dollars, for the purpose
of purchasing a site for a public park for said city, in
accordance with said report, by the issue and sale of city
bonds in compliance with the provisions of the act last
aforesaid.

Sufficient has been stated of the legislation on the sub-
ject to show that all action of the commissioners, up to
the time when an issue of bonds is ordered by the common
council, is provisional only, and that no debt is contracted
by the city, or legal obligation assumed, until affirmative
action is taken by that body upon the report of the com-
missioners. Why this action was required at all, if the
council were to have no important discretionary power in
the premises, it is needless for us to speculate, since both
parties concede that the purpose of the last act` was to take
away the discretionary power that was vested in the coun-
cil by the first, and that suitable and peremptory language
has been employed for that purpose. And we shall consider
this case upon the assumption that the parties have cor-
rectly construed this legislation.

The failure, then, of the common council to comply
with the request of the board of park commissioners has,
in their opinion, imposed a public duty upon the judicial
department, which we must perform on the facts being
properly reported. That duty—to state it nakedly—is, by
the compulsory process of this court, to coerce the city of
Detroit into entering into contracts involving a debt for a
very large sum for an object purely of local concern, which
the legislative body of the city has refused to make.

The proposition that there rests in this or any other
court the authority to compel a municipal body to contract
debts for local purposes against its will, is one so momen-
tous in its importance, and so pregnant with possible con-

sequences, that we could not fail to be solicitous when it
was presented that its foundations should be thoroughly
canvassed and presented, and that we might have before us,
in passing upon it, all the considerations that could be
urged in its support.    In this our desire has been gratified
to the utmost ; as it is seldom a case receives so thorough
and exhaustive an examination by counsel at once so able
and apparently so thoroughly convinced of the correctness
of their conclusions.    And if we fail to notice in our judg-
ment all the considerations that may possibly bear upon
the subject, it will not be because they were not brought
to our attention and pressed with ability and force, but
because others seem to us conclusive.

The general proposition we have stated may be said to
be deduced by the relators from several minor propositions,
which we shall endeavor to condense and state in substance
as follows :

1. The legislature creates municipal corporations, defines
and limits their powers, enlarges or diminishes them at
will, points out the agencies which are to exercise them,
and exercises a general supervision and control of them as
it shall deem proper and needful for the public welfare.

2. The legislature confers upon the bodies it has created
the power to make contracts and to levy taxes for their
performance, but in matters of public concern it is not
limited to conferring a discretionary power, but may exer-
cise compulsory authority where the local officers or agen-
cies neglect or refuse to discharge their public duty in pro-
viding for the public needs of the locality, or in voting or
levying the proper taxes for public purposes.

3. While the state cannot appoint the officers who are
to have charge and management of local affairs, it may
apportion the local powers among them as it sees fit, and
confide them from time to time to such as are thought
most likely to exercise them in accordance with the law
and for the public good.

4. As a corollary from the preceding it was entirely competent for the legislature of 1873 to take from the common council and the freemen where before it was vested, the power to decide upon a purchase of lands for a park, and to vest it in a board of local officers chosen by the voters of the city, or their representatives in the common council; and that as the board of park commissioners, since their recognition as such by the common council, are to be deemed and taken to be local officers, locally chosen, the act of 1873 is to be regarded only as an apportionment of local duties and powers among local officers, and not as an attempt by the state to control unwarrantedly the local government. For, considered as local officers chosen by the municipality, the board of park commissioners are claimed to be as truly the representatives of the people of Detroit as the common council itself, and may as properly be vested with large discretionary power over this subject.

5. The common council having only a ministerial duty to perform after the board had acted, they may be compelled to perform that duty by the usual process.

This is believed to be an accurate statement, in substance and in our own language, of the positions so ably presented and urged on behalf of the relators; and it must be conceded that if the first four are sound, the fifth must follow logically. The performance of a mere ministerial duty may as well be enforced when it rests upon an aggregate body like the common council, as when incumbent upon a single officer. We may therefore address ourselves at once to the propositions which are supposed to fix upon the council the duty which this proceeding seeks to compel that body to perform.

In *People v. Hurlbut, 24 Mich., 44*, we considered at some length the proposition which asserts the amplitude of legislative control over municipal corporations, and we there conceded that when confined, as it should be, to such corporations as agencies of the state in its government, the

proposition is entirely sound. In all matters of general concern there is no local right to act independently of the state; and the local authorities cannot be permitted to determine for themselves whether they will contribute through taxation to the support of the state government, or assist when called upon to suppress insurrections, or aid in the enforcement of the police laws. Upon all such subjects the state may exercise compulsory authority, and may enforce the performance of local duties, either by employing local officers for the purpose, or through agents or officers of its own appointment. The same doctrine was declared in *People v. Mahaney, 13 Mich., 481,* and in *Bay City v. State Treasurer, 23 Mich., 503.* It was also recognized in the statement that in the levy of taxes for purposes of general concern the municipal bodies cannot demand a right to be consulted, and their consent is immaterial. And we concur fully in the views which have been expressed by other courts in the cases to which our attention was called on the argument, that as regards duties which the people in the several localities owe to the commonwealth at large, they cannot be allowed a discretionary authority to perform them or not as they may choose. Such an authority would be wholly inconsistent with any thing like regular or uniform government in the state.

But we also endeavored to show in *People v. Hurlbut,* that though municipal authorities are made use of in state government, and as such are under complete state control, they are not created exclusively for that purpose, but have other objects and purposes peculiarly local, and in which the state at large, except in conferring the power and regulating its exercise, is legally no more concerned than it is in the individual and private concerns of its several citizens. Indeed, it would be easy to show that it is not from the standpoint of state interest, but from that of local interest, that the necessity of incorporating cities and villages most distinctly appears. State duties of a local

nature can for the most part be very well performed through the employment of the usual township and county organizations, so that if the state alone, in its corporate capacity, were to be regarded, the conferring of special corporate powers on cities and villages might very well be dispensed with. It is because where an urban population is collected many things are necessary for their comfort and protection which are not needed in the country, and which the county and township organizations, with their imperfect powers and machinery, cannot well supply, that the state is then called upon to confer larger powers, and to make of the locality a subordinate commonwealth, which, while it shall perform for the state wholly or in part what the county and township officers performed before, shall also be endowed with capacities to provide for its citizens such matters of necessity or convenience as their health, protection, comfort or enjoyment as a political community may demand. Indeed, it is a matter of general observation that the state does not force upon the local community these larger powers, but waits to be solicited to confer them when the people interested shall deem them for their advantage. This is so well understood that in many of the states it has been decided that a municipal corporation may justly be held, when receiving its charter, to contract in consideration of the powers conferred, that its authority shall perform towards all parties concerned, the several duties imposed upon the corporation, and may be held liable in damages for their failure to perform them. And although we have not followed those decisions in this state, the two-fold character of these corporations, as organizations on the one hand for state purposes, and on the other for the benefit of the individual corporators, has invariably been recognized by this court wherever there has been occasion to refer to it.

We also referred, in *People v. Hurlbut*, to several decisions in the federal supreme court, and elsewhere, to show

that municipal corporations, considered as communities
endowed with peculiar functions for the benefit of their
own citizens, have always been recognized as possessing
powers and capacities, and as being entitled to exemptions,
distinct from those which they possess or can claim as
conveniences in state government. If the authorities are
examined it will be found that these powers and capacities,
and the interests which are acquired under them, are usu-
ally spoken of as *private,* in contradiction to those in
which the state is concerned, and which are called *public;*
thus putting these corporations, as regards all such powers,
capacities and interests, substantially on the footing of
private corporations. This distinction is very carefully
drawn in *Bailey v. New York, 3 Hill, 531,* which con-
cerned the New York water works, and also in *Small v.
Danville, 51 Me., 362; Philadelphia v. Fox, 64 Penn. St.,
180;* and *Western College v. Cleveland, 12 Ohio, N. S., 375.*
It is well stated by Lewis, Ch. J., in *Western Saving Fund
Society v. Philadelphia, 31 Penn. St., 183,* in speaking of a
municipal corporation as the owner of gas works: "The
supply of gas-light," he says, "is no more a duty of sov-
ereignty than the supply of water. Both these objects may
be accomplished through the agency of individuals, or pri-
vate corporations, and in very many instances they are
accomplished by these means. If this power is granted to
a borough or a city, it is *a special private franchise,* made
as well for the *private* emolument and advantage of the
city as for the public good. The whole investment is the
private property of the city; as much so as the lands and
houses belonging to it. Blending the two powers in one
grant does not destroy the clear and well settled distinc-
tion, and the process of separation is not rendered impos-
sible by the confusion. In separating them, regard must
be had to the object of the legislature in conferring them.
If granted for public purposes exclusively, they belong to
the corporate body in its public, political or municipal

character.    But if the grant was for purposes of private advantage and emolument, though the public may derive a common benefit therefrom, the corporation *quoad hoc* is to be regarded as a private company.    It stands on the same footing as would any individual or body of persons upon whom the like special franchises had been conferred." In *San Francisco Gas Company v. San Francisco, 9 Cal., 453,* it is held that in providing light for corporate conveniences, a municipal corporation is on the same footing with a private corporation, and may be held liable on implied contract.    In *Oliver v. Worcester, 102 Mass., 499,* a like distinction is drawn between the public and private capacities and responsibilities of municipal corporations.    And in *Dillon on Municipal Corporations,* § *39,* pains are taken to collect many authorities to the same effect.    Indeed, the history of municipal corporations in the country from which we derive our institutions will show that they first came into existence by spontaneous local action of their members, taken for their own benefit and protection, and that their recognition and employment as agencies of a character which can be called public, considered with reference to the realm at large, was later, and was based rather upon their local, and what may properly be called their private wealth, influence and importance, already existing and established, than upon any necessity that such corporations should be created and should exist for the purposes of general government.    The government found convenient instrumentalities in existence, and it made use of them for its purposes; but they were first brought into existence from considerations which addressed themselves to the interests of the corporators, and concerned their individual protection, prosperity and welfare.    And the city of London has always been, and is now, vastly more important in its private capacity as a corporation than in its public capacity as an agent of government.

We should not discuss this subject in the present case

if the course of the argument had not seemed to indicate
that our opinions in *People v. Hurlbut* had been, to some
extent, misapprehended.    We intended, in that case, to con-
cede most fully that the state must determine for each of
its municipal corporations the powers it should exercise,
and the capacities it should possess, and that it must also
decide what restrictions should be placed upon these, as
well to prevent clashing of action and interest in the state,
as to protect individual corporators against injustice and
oppression at the hands of the local majority.    And what
we said in that case we here repeat, that while it is a fun-
damental principle in this state, recognized and perpetuated
by express provisions of the constitution, that the people of
every hamlet, town and city of the state are entitled to
the benefits of local self-government, the constitution has
not pointed out the precise extent of local powers and
capacities, but has left them to be determined in each case
by the legislative authority of the state, from considerations
of general policy, as well as those which pertain to the
local benefit and local desires.    And in conferring those
powers it is not to be disputed that the legislature may
give extensive capacity to acquire and hold property for
local purposes, or it may confine the authority within nar-
row bounds; and what it thus confers it may enlarge,
restrict or take away at pleasure.

But it cannot be contended that authority in the legis-
lature to determine what shall be the extent of capacity in
a city to acquire and hold property, is equivalent to, or
contains within itself the authority to deprive the city of
property actually acquired by legislative permission.    As to
the property it thus holds for its own private purposes, a
city is to be regarded as a constituent in state government,
and is entitled to the like protection in its property rights
as any natural person who is also a constituent.    The
right of the state as regards such property, is a right of
regulation, and though broader than exists in the case of

individuals, is not a right of appropriation.    The consti-
tutional principle that no person shall be deprived of
property without due process of law, applies to artificial
persons as well as natural, and to municipal corporations
in their private capacity, as well as to corporations
for manufacturing and commercial purposes.    And when a
local convenience or need is to be supplied in which the
people of the state at large, or any portion thereof outside
the city limits, are not concerned, the state can no more
by a process of taxation take from the individual citizens
the money to purchase it, than they could, if it had been
procured, appropriate it to state use.    To this extent the
corporate right appears to us to be a clear and undoubted
exception to the general power of control which is vested
in the state.

Whoever insists upon the right of the state to interfere
and control by compulsory legislation the action of the
local constituency in matters exclusively of local concern,
should be prepared to defend a like interference in the
action of private corporations and of natural persons.    It
is as easy to justify on principle, a law which permits the
rest of the community to dictate to an individual what he
shall eat, and what he shall drink, and what he shall wear,
as to show any constitutional basis for one under which
the people of other parts of the state, through their repre-
sentatives, dictate to the city of Detroit what fountains
shall be erected at its expense for the use of its citizens,
or at what cost it shall purchase, and how it shall improve
and embellish a park or boulevard for the recreation and
enjoyment of its citizens.    The one law would rest upon
the same fallacy as the other, and the reasons for opposing
and contesting it would be the same in each case.    And
while it may be entirely possible that in any particular
instance the interference would be beneficial to the person
or the community whose rights are invaded, it is not to be
overlooked that an interference to compel a person to sub-

28 MICH.—31.

mit to something for his own good, may be made use of
as a precedent to compel him at some future time to sub-
mit to extortion and plunder.   The law very properly draws
a line between that which is admissible and that which is
not, and it does not allow outside dictation in matters
purely of local concern, for one very good reason, among
others equally good, that the motive for outside interference
will very likely be something besides a desire to do good to
a community in which the parties interfering have no per-
sonal interest, unless of a merely sentimental nature, and
whose burdens they are not to share, or enjoyments partici-
pate in.    All such matters are left to those whose interests
will prompt them to act with prudence, and who, because
of their interest, and because they relate to matters that
must come under their own view and observation, they are
presumptively best qualified to decide upon.    And while
we do not question that where state interference has
improperly been invoked in municipal affairs in this state,
and state appointments been made for municipal govern-
ment, the motive has been correct and the appointments
been of those who, on personal grounds, were wholly unex-
ceptionable, it may not be improper to state, that in that
sister state in which a like power has been most often exer-
cised, and whose legislative precedents were cited on the
argument, while the pretense always was that the inter-
ference was necessary to correct some local evil or promote
some local good, the general result of a disregard of sound
principle followed, and a system of corruption and disorder
was introduced which it became at last appalling to contem-
plate.    But as bad motives cannot render a constitutional
law invalid, neither can good motives legalize usurpation.

We affirm, then, that the city of Detroit has the right
to decide for itself upon the purchase of a public park.
The next question concerns the agency by which this
decision shall be made.    Under the act of 1871 the final
decision was to be made in a citizens' meeting, but this

democratic feature in city government is now taken away,
and for the very sufficient reason that a city of the size of
Detroit cannot possibly assemble its citizens, to consult and
advise upon such subjects, and must necessarily express the
public will through representatives.   It is probably true, as
stated on the argument, that no public park could ever
have been determined upon in citizens' meeting, and the
legislation of 1873, so far as it abolished that feature, was
doubtless wise and salutary.   At any rate it was clearly
within the legislative power, and it only remains to con-
sider whether, under that legislation, the park commission-
ers in determining upon and purchasing the ground for a
park can be regarded as representatives of the people of
Detroit.

The argument on this branch of the case is, that the
park commissioners, being city officers, the legislature,
when they took from the common council and the citi-
zens' meeting the power to decide finally on the purchase
of a park, and conferred it on these commissioners, was
only exercising an unquestioned authority in the apportion-
ment of local powers and duties among local officers, as
should be deemed most for the local good.   The common
council, it is claimed, not being a body provided for in the
constitution, can have no vested rights in any particular
powers or duties, and the rights of local government are
just as much regarded, and presumptively as well protected,
when the local powers and duties are apportioned among
other officers, as when all are left to the judgment and dis-
cretion of the council.   But whether this is so or not, the
right of the legislature to make the apportionment, it is
insisted, is unquestionable, and from the nature of the case,
unless particular restraints can be pointed out in the con-
stitution itself, must be unlimited.

Conceding, as we already have, the general right of the
legislature to prescribe the duties and authority of munici-
pal officers, it would nevertheless be easy to demonstrate

that unless there are some limitations upon that right, the constitutional guaranty of local self-government would be without meaning or value. Many things might be suggested so utterly destructive of the local municipal institutions which have been handed down to us, that the most strenuous advocate of legislative authority would admit without hesitation that they were forbidden by the constitution. If we may suppose, for an illustration, that the legislature shall provide that in Detroit a single person may be chosen in whom may be vested the whole legislative authority of the city, and all other authority pertaining to local government of every description and nature, not expressly by the constitution confided to officers specified, it would require unusual boldness in any one who should undertake to defend such a local dictatorship as something within the competency of legislation under a constitution avowedly framed to guard, protect and defend the local powers and local liberties.

We desire to guard in this case against expressing opinions on abstract questions, or upon any not directly involved; and therefore shall avoid the utterance of any views which either of us may possibly hold upon the question which has been suggested, whether the common council may not be so far a distinctive feature in municipal government as to be understood and by implication retained when that government is provided for. The case before us will be disposed of without reaching any such question. This is one in which the powers in question have been conferred upon the park commissioners after its members were chosen, and it obviously presents a different question from what it would had the powers taken from the common council and the people by the act of 1873 been transferred to the board before the appointment of its members, and the choice been made with reference to the powers to be exercised. The point now to be determined is, whether for the purposes of the purchase proposed the park commissioners can be regarded as the representatives of the people of Detroit chosen to make it.

BOARD OF PARK COMMISSIONERS *v.* COMMON COUNCIL OF DETROIT.

A representative, as we understand it, is one chosen by a principal to exercise for him a power or perform for him a trust. In that sense the mayor of Detroit is a representative for some purposes, the members of the common council for others, and the members of the board of education for still others. But the idea of a representative implies not merely a person chosen for some purpose, but a person chosen for a particular purpose, and confided in to represent his principal therein. One person may be thought suited to one duty, and another to another; and the right to be represented implies a right not merely to name the person, but also to designate the trust that shall be confided to him. That government would be but a mockery of republican institutions, which, while leaving to the people a choice of officers, should afterwards determine whether any particular officer who had been selected by the people should be a legislator or a judge, a governor or a policeman. The constables of Detroit are chosen by popular vote, and for the purposes of their office are the servants, the agents, the representatives of the people; but it would be absurd to speak of the people of Detroit as governed by their representatives if after these constables had been chosen for the performance of ministerial and police duties the legislature might so amend the city charter as to confer upon these officers the full powers of local government which, when they were chosen, were vested in the council. It would be difficult to conceive of any action which would more effectually set aside republican government, and deprive the people of their undoubted rights and constitutional liberties, than an act of this nature, which, while it placed no person in power whom the people had not chosen, would nevertheless so pervert the power as to place persons chosen for inferior duties for which they were fit, in the high and responsible positions in municipal government, where the people would refuse to trust them.

The case supposed is of course extreme and wholly

` improbable, but sometimes to suppose an extreme case is
the best method of demonstrating the danger of false
doctrines.    What we desire clearly to express is simply
this: that that is not a representative government in
which the people are not permitted to say in what trusts
their agents shall represent them.    Nor in saying this do
we deny the authority of the legislature to modify the
powers and duties of existing local officers.    It is not
doubted that such a power exists, and its exercise tends
greatly to the improvement of local administration in many
cases.    Indeed, it is a necessary power if valuable changes
are to be brought about, and its exercise from time to time
must always be considered as possible, and therefore always
within the contemplation of the people when their officers
are chosen.    But the changes and modifications, when they
relate to matters which concern the private interests and
property of the city, must be in the same general direc-
tion, and not give authority of other and a higher nature,
which might require for its exercise different experience,
intelligence, capacity and discretion.    And while all legisla-
tive as well as judicial bodies should be careful not to be
over-nice or technical in considering the changes proposed
or made where the object sought is a *bona fide* improvement in
the functions of a representative, so on the other hand is it
specially incumbent on all to take care that the mere bodiless
shadow of republican government be not by such a method sub-
stituted for the reality, and that while the people are suffered
to go through the forms of an election, there shall not rest in
some authority at a distance, the power to deprive the elec-
tion of any valuable significance.    On this point reference is
had to what is said by Justice Graves in *People v. Hurlbut,*
*24 Mich., 114.*

The city of Detroit is found to have accepted the state
appointees as its representatives in the park commission; but
for what purpose and on what understanding?    Obviously
it was with the purpose and on the understanding that

they should have the powers and perform the duties pointed out in the act of 1871. The people did not accept them as mayors, or common councilmen, or members of the board of education, or water commissioners. The right to choose their representatives in all these offices they understood was still reserved to themselves. In empowering the commissioners to act for them they may be supposed to have addressed them substantially in the language of the act of 1871, and informed them they had been chosen to examine lands for the site of a park, and to report their opinion if they found one suitable, but that the question whether one should be purchased or not was expressly reserved to the common council and the people. They did not say to them, we choose you our agents for any thing the legislature may hereafter direct you to do on our behalf; but we choose you our agents to perform this particular duty.

The powers specified in the act of 1871, though requiring for their proper discharge a high order of intelligence and cultivation, were nevertheless purely advisory at first and administrative afterwards. How is it with the powers specified in the act of 1873? Are they the same in nature or alike in grade? In one sense it may be said they are similar in kind, because they relate to the same subject, that is to say, to the establishment of a city park. But obviously a power to advise the city to buy property if its citizens shall choose to do so, and shall voluntarily incur the cost, is not the same in degree or in nature with a power to bind the city irrevocably to a purchase which its citizens may protest against, and to compel them to incur a heavy debt for an object they may not desire. An agency to advise one to make a purchase has no relationship to a power to make it for him whether he will or no, and forcibly, by the aid of legal process, to appropriate his property to pay for it.

There is indeed no real similarity in the powers to be exercised under the act of 1873 to those specified in the

previous act. The latter were limited, and reserved all substantial powers to the council and the people; the former are powers of final action, and place the commissioners, in matters of the very highest importance, over both council and people. In making contracts and creating debts for the city, the commissioners are in effect exercising a power of taxation, which is one of the highest attributes of sovereignty, and the distance between their former power to advise, and the power now claimed to compel, can only be adequately measured when it is perceived that the one belongs to the lowest grade of powers, while the power to tax is the highest that can exist in local municipal government. No precedent entitled to respect can justify such a change of powers; for, from the very dawn of our liberties the principle most unquestionable of all has been this: that the people shall vote the taxes they are to pay, or be permitted to choose representatives for the purpose.

We cannot therefore say that the board of park commissioners are representatives of the city of Detroit for the purpose named, because to do so would be to hold that the shadow is the same as the substance, and that servant and ruler are convertible terms. The high and responsible trust created by the act of 1873, which concerns and will concern the happiness and prosperity, the health and comfort of that city for an indefinite future, the people of Detroit have not been permitted to fill. The persons named for it are the appointees of the legislature, and not of the city, and however disinterested and honorable may have been their course, and however wise and beneficent their contemplated action, we have no power to aid it by legal process, because, concerning as it does the private corporate interests of the city, it has been had without the consent of the city expressly or by implication given.

The *mandamus* prayed for must be denied.

CHRISTIANCY, CH. J., and GRAVES, J., concurred.

CAMPBELL, J.

How far the property already actually owned by municipalities is exempt from state legislation as private property, in the strict sense of the term, it is not necessary to consider in this case. There is very great reason for holding it exempt from any arbitrary interference so long as the municipal jurisdiction remains fixed. But possibly there may be valuable interests in the nature of property belonging to such bodies, which are subject to be affected injuriously by legislation without as large a right to compensation or immunity, as that which may be asserted by other corporations.

I concur entirely in all that has been said by my brother Cooley in demonstration of the right of cities to use their own discretion in regard to the purchase or acquisition of property or improvements of local concern. And I agree with him that in giving to these commissioners the power of binding the city by their doings in the purchase and selection of lands, the state has to all intents and purposes made them its own agents, and not agents of the city, and that their action is in no sense city action. It has been settled by our previous decisions that the state cannot put its own agencies in charge of any such functions.

I am not willing, however, to leave out of view an objection which has seemed to me quite as fundamental as the one referred to, and more dangerous, if that be possible, in its tendencies. I think that the very essence of municipal existence consists in a government which allows no discretionary power beyond that of mere administration to be exercised without the immediate or ultimate control of the freemen or their immediate representatives. A city is, and must be, as I conceive, a unit for purposes of government; and all bodies employed in the service of the municipality, and not directly representing the freemen, must act as agencies subordinate to the council. If powers in any way involv-

28 MICH.—32.

ing the municipal prerogative can be given to any bodies
except the common council, to the exclusion of any regu-
lation or control of that body, they can all be so given, and
the people may be entirely deprived of representative gov-
ernment.    It is a misnomer to apply that term to a sys-
tem where there is any legislative power over which the
people's representatives have no control.    A school district
is as well recognized a municipality as a city, and may co-
exist with it in territory in whole or in part, as a city may
cover the territory of a county wholly or partially.    There
is no incompatibility between them, and both are separate
and in some sense independent popular representative bodies
exercising different functions.    The duties of the others
are no part of the ordinary concerns of town or city cor-
porations.    But from time immemorial every municipal
government, properly so called, and acting within its pecu-
liar sphere, has acted through its common council, com-
posed either of the burgesses or their representatives, sub-
ject in some cases to checks and vetoes, but not subject to
legislation or final action in defiance of their own decisions.
Their supremacy cannot be given up by themselves any-
more than it can be taken from them.    No doubt the
state can limit their powers, but it cannot transfer them.
The appointment and incorporation of boards as mere
agencies is competent, and may be very convenient.    But
making them any thing but agencies is a direct invasion
of representative government, and would bring into exist-
ence a class of cities unknown to our institutions, and
very different from the municipal corporations recognized
by our constitution as the authorized recipients of local
legislative power.    Whether the law of 1871 contains any
provisions obnoxious to this principle it is not necessary to
discuss.    But if there are such provisions, I do not con-
ceive they could be made valid by any recognition from
the city.

Concurring entirely in the general views of my brother

Cooley, I have not deemed it necessary to do more than indicate very briefly my views on the point which he has waived, which, in my judgment, is inseparable from the principles underlying the decisions heretofore made in *People v. Hurlbut, 24 Mich., 44,* and in *Hubbard v. Town Board of Springwells, 25 Mich. R., 153.*

I therefore agree in the conclusion of my brethren.