*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK GOTTLEBER and ROSE GOTTLEBER,

      Plaintiff-Appellants,

v

COUNTY OF SAGINAW,

      Defendant-Appellee.

UNPUBLISHED
August 1, 2019

No. 336011
Bay Circuit Court
LC No. 12-003406-CZ

## ON REMAND

Before: SAWYER, P.J., and CAVANAGH and FORT HOOD, JJ.

PER CURIAM.

In this inverse condemnation action, plaintiffs appeal as of right the trial court's order granting defendant summary disposition. This case returns to us on remand from our Supreme Court "for consideration of an argument made by defendant but not directly addressed by [this] Court regarding whether the defendant had a legal duty or obligation to continue pumping and draining water on its land in order to sustain a particular groundwater level for the benefit of the plaintiffs' property." *Gottleber v Saginaw Co*, ___ Mich ___; 927 NW2d 224 (2019). If we conclude that defendant had no such duty, the Supreme Court has further directed us to consider whether defendant "abused its legitimate powers" by taking "affirmative actions" that were "directly aimed" at plaintiffs' property. *Id*. For the reasons stated below, we again reverse and remand for further proceedings in the trial court.

## I. FACTUAL BACKGROUND

In 1994, plaintiffs purchased a 93-acre parcel of land next to the Saginaw River. Plaintiffs farmed the land until 2006, and then leased the land to a tenant who continued to farm the land from 2006 to 2009. It is undisputed that the land at issue would be a wetland if left in its natural state. Like other farmers in the area, to make the land farmable, plaintiffs pumped water from the land every April and May, and sometimes at other times depending on rainfall.

The dispute in this matter stems from a project between the United States Army Corps of Engineers (USACE) and defendant. Evidence presented at trial indicates that—at the request of

the state of Michigan, Bay County, and defendant—the USACE and defendant entered a Project Cooperation Agreement that detailed a plan to construct and operate a Dredged Material Disposal Facility (DMDF). The purpose of the DMDF was to serve as a disposal site for materials dredged from the bottom of the Saginaw River, which requires periodic dredging in order to function as a commercial shipping waterway. The USACE would select land on which to place the DMDF and defendant was to acquire the land. The USACE would then construct, operate, and maintain the DMDF. The USACE selected two parcels of farmland that adjoined plaintiffs' property for the project, defendant purchased those parcels, and the DMDF was constructed. A pipeline now conveys materials dredged from the Saginaw River, including water and contaminated sediment, to the DMDF, and after the contaminated sediment settles into the DMDF, the remaining water is discharged back into the river.

As we noted in our prior opinion, the Michigan Department of Environmental Quality required the construction of a Wetland Mitigation Area (WMA) to mitigate the environmental impact of the DMDF. *Gottleber v Saginaw*, unpublished opinion of the Court of Appeals, issued June 12, 2018 (Docket No. 336011), p 2. Defendant created the WMA by discontinuing pumping that had been performed by previous landowners of the area directly surrounding the DMDF. The WMA is next to the western border of plaintiffs' property, and is separated from plaintiffs' property by a "railroad grade made out of soil." *Id*. at 2-3.

Plaintiffs instituted their inverse condemnation action in 2012, contending that, beginning in 2009, water began overflowing from the WMA and flooding plaintiffs' property. Plaintiffs provided an expert witness, Dr. Rick Harding, who opined that the construction of the DMDF and the cessation of pumping that created the WMA each contributed to the flooding. Dr. Harding testified that the railroad grade separating the WMA from plaintiffs' property allowed water to leak through it onto plaintiffs' property, and that clay berms constructed around the DMDF prevented groundwater from flowing west of the WMA toward the facility, causing groundwater to flow to plaintiffs' property instead. According to plaintiffs, flooding on their property has prevented them from using the land for any economically feasible purpose, such as leasing, selling, developing, or farming the land.

After plaintiffs filed their inverse condemnation action, the trial court granted defendant summary disposition, concluding that (1) defendant had no liability with respect to the DMDF because it was a federal project, and (2) even though the WMA was separately owned and operated by defendant, the cessation of pumping water in the WMA did not constitute an "affirmative act necessary to create liability" on the part of defendant. On appeal, this Court rejected the position that defendant had no liability for the DMDF, noting that defendant was heavily involved in the project. *Gottleber*, unpub op at 5-6. With respect to the WMA, this Court wrote:

> Although "inaction and omissions by the state cannot be found to constitute a taking," *Attorney Gen v Ankersen*, 148 Mich App 524, 562; 385 NW2d 658 (1986), the record evidence confirms that defendant did more than simply stop pumping water to create the WMA—it also removed the tile draining systems that were previously on the WMA land. Put another way, even though defendant's cessation of pumping may not be considered an affirmative action in itself, see *Ankersen*, 148 Mich App at 562, defendant's removal of the tile

drainage systems was a deliberate and overt action that was more than mere inaction or omission. Thus, defendant's removal of the tile draining system, along with its cessation of pumping the water on the WMA land, which had been historically pumped and drained and which plaintiffs had relied on to be pumped and drained, constituted an affirmative action sufficient for inverse condemnation liability purposes. [*Id*. at 6 (footnote omitted).]

At the end of the quoted passage reproduced above, this Court wrote in a footnote:

While defendant argues that it had no legal duty or obligation to continue pumping and draining the water on the WMA land in order to sustain a particular groundwater level for plaintiffs' benefit, the issue that we must decide is whether defendant's actions or inaction support a claim of inverse condemnation. At most, defendant's argument that it had no duty to pump its own property to maintain lowered water levels goes to whether genuine issues of material fact exist concerning whether defendant's cessation of pumping and draining was 'directly aimed at plaintiff[s'] property." *Marilyn Froling Revocable Living Trust*[ *v Bloomfield Hills Country Club*], 283 Mich App [264,] 294-295[; 769 NW2d 234 (2009). Indeed, although defendant asserts that "plaintiffs have no legally enforceable right to require defendant to continue the artificial draining and pumping of its land," it is unclear whether defendant was aware that its removal of the draining tiles and cessation of pumping would directly affect the Gottleber property by increasing the groundwater levels in the area. Considering the complexity of the facts and the existing record evidence concerning whether defendant's actions were "directly aimed" at the Gottleber property, there were genuine issues of material fact that should be submitted and determined by the jury. [*Id*. at 6-7 n 1.]

This Court went on to reject two arguments made by defendant: (1) that plaintiffs failed to present evidence creating a question of fact regarding the cause of the flooding on their property, and (2) that defendant was immune from liability because its actions were taken under the supervision of, or in conjunction with, the USACE. *Id*. at 7-9.

Defendant filed a motion for reconsideration taking issue with the footnote in this Court's unpublished opinion regarding defendant's argument that it had no duty to continue to pump or drain water from the property it acquired. Defendant argued that this Court erroneously held that whether such a duty existed was a factual question for the jury, when in truth, the existence of such a duty would be a legal question. Plaintiffs contended in response that defendant's argument ignored the fact that defendant had taken affirmative actions to remove tile drainage systems to change groundwater levels around the WMA and DMDF. This Court denied reconsideration. *Gottleber v Saginaw Co*, unpublished order of the Court of Appeals, entered July 13, 2018 (Docket No. 336011).

Defendant then sought leave to appeal to our Supreme Court. Among some other things, defendant argued that it had no duty to artificially pump and drain the land it purchased, and that this Court had refused to decide whether such a duty existed. Defendant contended that its rights were the same as any landowner, and that accordingly, it had no duty to artificially change the

natural flow of water for the benefit of adjoining landowners. Rather, adjoining landowners had to accept whatever water naturally flowed to their property. Defendant further contended that, while defendant could not artificially concentrate or increase the flow of water from its property to adjoining lands, plaintiffs had failed to show that the flooding they were experiencing was anything more than that caused by natural water flow. As explained, our Supreme Court has now remanded the matter to this Court for consideration of the question whether defendant has a duty to "continue pumping and draining water on its land . . . ." *Gottleber*, 927 NW2d at 224. If this Court finds no such duty, this Court has been directed to then consider whether defendant " 'abused its legitimate powers' when it took 'affirmative actions' in the absence of any duty or obligation that potentially were 'directly aimed at the plaintiff[s'] property.' " *Id*. (citation omitted).

## II. ANALYSIS

The first question that our Supreme Court has directed us to address is whether defendant has a legal duty to continue pumping and draining water in the same manner as was done by prior owners of defendant's property. Although we conclude that defendant does not have such a duty, we nonetheless reaffirm our previous holding that summary disposition was not appropriate, and that plaintiffs should have been permitted to pursue their inverse condemnation claim.

In this case, defendant purchased the land on which the DMDF is situated. A government entity that owns property is "entitled to the like protection in its property rights as any natural person . . . ." *People ex rel Bd of Detroit Park Comm v Detroit Common Council*, 28 Mich 228, 240 (1873). As a general matter, a property owner has no right to complain about natural water flows that come from neighboring properties. *Bennett v Eaton Co*, 340 Mich 330, 335-336; 65 NW2d 794 (1954). In addition, generally, property owners cannot complain that a neighbor has stopped controlling water in a way done previously; there is no right to the continued maintenance of an artificial water level. *Hudson v Village of Homer*, 351 Mich 73, 80-83; 87 NW2d 72 (1957) (owners of artificially created pond could alter the water level of the pond between the artificial high-water mark and the natural level); *Goodrich v McMillan*, 217 Mich 630, 632-634; 187 NW 368 (1922) (landowner was under no duty to repair a dam that, before failing, created desirable waterways over neighboring land).[1] While the aforementioned cases involved neighbors who wished to see artificially high water levels continue, we see no reason why the same rule would not apply to a neighbor who has benefited from the maintenance of artificially low water levels.

Thus, we would tend to agree that defendant would have been fully within its rights to shut off the pumps, remove the existing drain tiles, and return the land *to its natural state* if that was defendant's desire. Had defendant done so, and had this caused some increase in water flow to plaintiffs' property, plaintiffs would have had no reason to complain. However, while a

---

[1] We note that, although a party may make a claim to a prescriptive right to maintenance of an artificial water level, plaintiffs have made no such claim in this case. *Stidham v Algonquin Lake Community Ass'n*, 133 Mich App 94, 99; 348 NW2d 46 (1984).

property owner is generally not obliged to alter natural water flows to the benefit of neighboring property owners, it is equally true that a property owner "cannot lawfully concentrate such water, and pour it through an artificial ditch or drain, in unusual quantities and greater velocity, upon an adjacent proprietor." *Bennett*, 340 Mich at 336 (quotation marks and citation omitted). Thus, "public authorities have [no] right to divert the natural course of surface water so as to impose on the land of one person the servitude which naturally belongs upon the land of another." *Id*. (quotation marks and citation omitted).

With that in mind, we turn to the second question posed by our Supreme Court: whether defendant abused its legitimate powers by taking affirmative actions directly aimed at plaintiffs' property. Essentially, what is being asked is whether plaintiffs may proceed on their inverse condemnation claim. In *Marilyn Froling Revocable Living Trust*, 283 Mich App at 294-295, this Court explained what a plaintiff must show to prevail on an inverse condemnation claim:

> A taking for purposes of inverse condemnation means that governmental action has permanently deprived the property owner of any possession or use of the property. When such a taking occurs, the Michigan Constitution entitles the property owner to compensation for the value of the property taken. A plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages. For a taking to occur, "there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of property." In other words, the plaintiff must prove that the government's actions were a substantial cause of the decline of the value of the plaintiff's property and must establish that the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property. In determining whether a taking occurred, the form, intensity, and deliberateness of the governmental actions toward the injured party's property must be examined. [Citations omitted.]

While defendant did not clearly make this point before this Court issued its prior opinion, in defendant's reconsideration motion, and more clearly, in its application to the Supreme Court, defendant contended that no such claim could be made here because defendant acted within its rights by turning off the pumps and eliminating the drainage system. Defendant explained that plaintiffs would have no right to complain about any increased flow of water that would occur if the land was returned to its natural state. From there, defendant argued that, because plaintiffs failed to show precisely how much water flowing to their property exceeded that which would naturally occur, plaintiffs' claim could not survive defendant's summary disposition motion.

As plaintiffs explained in response to the reconsideration motion filed in this Court, and again to the Supreme Court, defendant's argument ignores most of what is actually occurring on defendant's property. Several hundred thousand cubic yards of wet, dredged material is being brought to the site and contained within an eleven-foot tall, artificially constructed dike. The dike is constructed in such a way as to make it impermeable. On the other side of this dike is the WMA, an artificially created wetlands area. This area was created to replace what would otherwise be wetlands that are being filled in by the activities taking place in the DMDF. The only thing separating the WMA from plaintiffs' land is a railroad bed that, according to plaintiffs' evidence, is permeable. Clearly, neither the dredged materials, the eleven-foot-tall

impermeable dike, or the WMA represent naturally occurring features. These all represent artificial changes to the land.

While defendant may have been able to allow the land to return to its natural state by turning off the pumps and removing the drainage system, it is not permitted to artificially concentrate water and divert it to plaintiffs' land. *Bennett*, 340 Mich at 336. And, although Dr. Harding was not able to quantify precisely how much additional water is being diverted to plaintiffs' property as a result of these alterations, Dr. Harding nonetheless opined that these changes caused significant flooding on plaintiffs' property. Dr. Harding explained that the railroad bed "likely retards, but does not prevent, the movement of water across the bedding material because . . . the railroad bed consists of a mixture of different permeability materials." Dr. Harding explained that measurements of surface water elevations on either side of the railroad bed confirm that it was not holding back water contained in the artificially created WMA.

Dr. Harding also explained that construction of the DMDF required construction of the eleven-foot-tall dike. Drain tiles that were formerly in the area where this dike was constructed were removed. As a result, groundwater levels rose in the WMA. Because this impermeable dike has been constructed, and because no other drainage exists, ground and surface water that would have previously moved west from plaintiffs' land to the land now owned by defendant instead accumulates in the WMA. And, as explained, water that accumulates in the WMA migrates through the permeable railroad bed and into plaintiffs' property. In sum, according to Dr. Harding, defendant has altered the natural flow of water, concentrating it in an area directly adjacent to plaintiffs' property, and the only barrier that might prevent that water from flowing onto plaintiffs' property is not up to the task.

Thus, it is not only removal of the drainage systems and turning off the pipes that is the basis of plaintiffs' claim of inverse condemnation. Rather, the claim is based largely on the creation of the WMA. The WMA represents the artificial concentration of water next to plaintiffs' property, and plaintiffs have presented evidence showing that this concentration of water has caused substantial flooding on their property. Moreover, the WMA was created, in part, by removing the existing drainage system and ceasing pumping activities. As this Court previously explained, while the cessation of pumping activities might not "be considered an affirmative action in itself," the removal of the tile drainage system "was a deliberate and overt action that was more than mere inaction or omission." *Gottleber*, unpub op at 6.

The point is not that defendant had a legal duty to pump or drain water. The point, rather, is that the record evidence tends to show that, contrary to defendant's more recent arguments that it was simply returning the land to its natural state, defendant took these actions for a distinct purpose—to create the WMA. Dr. Harding's report indicates that the WMA has, in turn, caused substantial flooding on plaintiffs' property. As this Court previously explained, defendant's argument that it had no duty to pump or drain water is, at most, an argument going to the factual question of whether defendant's actions were directly aimed at plaintiffs' property. See *Marilyn Froling Revocable Living Trust*, 283 Mich App at 295 ("In determining whether a taking occurred, the form, intensity, and deliberateness of the governmental actions toward the injured party's property must be examined."). "Considering the complexity of the facts and the existing record evidence concerning whether defendant's actions were 'directly aimed' at the Gottleber

property, there were genuine issues of material fact that should be submitted to and determined by the jury." *Gottleber*, unpub op at 7 n 1.

We again reverse the trial court's order granting defendant summary disposition and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Karen M. Fort Hood