## BROUWER v. KENT COUNTY CLERK.

### DECISION OF THE COURT.

1. QUO WARRANTO—COUNTY BOARD OF SUPERVISORS—JURISDICTION—EQUALLY DIVIDED COURT.

Jurisdiction of quo warranto proceeding wherein it was held by trial judge that county board of supervisors was malapportioned is retained upon affirmance of judgment, per T. M. KAVANAGH, C. J., and SOURIS, SMITH, and ADAMS, JJ., and retained pending determination by Supreme Court of the United States as to whether 1-man 1-vote principle applies or does not apply to organization of county government in a State, per BLACK, J., the Supreme Court being equally divided between affirmance and reversal.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 20] 5 Am Jur 2d, Appeal and Error § 902.
44 Am Jur, Quo Warranto § 22 et seq.; §§ 54, 104.
25 Am Jur, Elections §§ 17, 37.
[2] 25 Am Jur 2d, Elections § 31.
Inequalities in population of election districts or voting units as rendering apportionment unconstitutional—Federal cases. 12 L ed 2d 1282.
[3] 25 Am Jur 2d, Elections § 34.
[4] 30A Am Jur, Judges § 15.
[5] 14 Am Jur, Counties §§ 7, 22, 23.
[6] 16 Am Jur 2d, Constitutional Law §§ 485, 488, 491.
[7, 10] 16 Am Jur 2d, Constitutional Law § 486.
[8] 16 Am Jur 2d, Constitutional Law § 488.
[9] 16 Am Jur 2d, Constitutional Law § 494.
[11] 16 Am Jur 2d, Constitutional Law §§ 488, 494.
[12] 16 Am Jur 2d, Constitutional Law §§ 58, 59.
[13] 16 Am Jur 2d, Constitutional Law §§ 58, 59.
25 Am Jur 2d, Elections § 11.
[14] 16 Am Jur 2d, Constitutional Law §§ 489, 492.
[15] 16 Am Jur 2d, Constitutional Law §§ 389–393.
[16] 25 Am Jur 2d, Elections § 31.
[17] 14 Am Jur, Counties §§ 26, 27.
[18] 25 Am Jur 2d, Elections §§ 32, 37.
[19] 5 Am Jur 2d, Appeal and Error § 1009.
[21] 25 Am Jur 2d, Elections §§ 16, 17.
[22] 25 Am Jur 2d, Elections § 31.
[23] 30A Am Jur, Judges § 27.
[24] 25 Am Jur 2d, Elections § 21.
28 Am Jur, Initiative, Referendum and Recall §§ 2, 7.
[25] 20 Am Jur 2d, Costs § 18.
[26] 44 Am Jur, Quo Warranto §§ 102, 104, 130.

SEPARATE OPINION FOR AFFIRMANCE.

T. M. KAVANAGH, C. J., and SOURIS, SMITH, and ADAMS, JJ.

2. CONSTITUTIONAL LAW—EQUAL PROTECTION—STATE LEGISLATURE—
POLITICAL SUBDIVISIONS.

*Application of the equality clause of the Constitution of the
United States by the Federal Supreme Court to require
that each house of a bicameral State legislature be elected
on a population basis was not thereby extended to legislative
bodies of political subdivisions of a State but was a recognition
that the right to exercise the franchise in a free and unimpaired
manner is preservative of other basic civil and political rights
(US Const, Am 14).*

3. SAME—FEDERAL JUDGES—EQUAL PROTECTION—COUNTY BOARD OF
SUPERVISORS.

*Whether the Federal judiciary should entertain claims relating
to the internal operations of State government need not be
decided in proceeding brought in State court for determination
as to application of equality clause with respect to election of
members of county board of supervisors (US Const, Am 14).*

4. JUDGES—OATHS—CONSTITUTIONAL LAW.

*Judges, State and Federal, are sworn to uphold the Federal,
as well as the State Constitution.*

5. COUNTIES—LOCAL SELF-GOVERNMENT.

*Local self-government, as reserved for the citizenry includes the
right to elect certain county officers (Const 1963, art 7, § 4).*

6. CONSTITUTIONAL LAW—EQUAL PROTECTION.

*The equality clause is not limited only to the protection of rights
granted by the Federal Constitution or otherwise protected by
it, but extends to all rights whether granted by Federal or
State Constitutions, statutes, or executive orders, and against
all forms of State action, executive, legislative, or judicial (US
Const, Am 14).*

7. SAME—EQUAL PROTECTION.

*Equal protection of the laws means subjection to equal laws,
applying alike to all in the same situation (US Const, Am 14).*

8. SAME—EQUAL PROTECTION.

*The inhibition of the equal protection clause is that no State
shall deprive any person within its jurisdiction of the equal
protection of the laws and was designed to prevent any person
or class of persons from being singled out as a special subject
for discriminating and hostile legislation (US Const, Am 14).*

9. SAME—EQUAL PROTECTION—CLASSIFICATION.

*Permissible reasonable classification, to avoid doing violence to the equal protection clause, must be based upon some real and substantial, not arbitrary distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed (US Const, Am 14).*

10. SAME—EQUAL PROTECTION.

*The equal protection clause is not susceptible of exact delimitation (US Const, Am 14).*

11. SAME—EQUAL PROTECTION—STATES.

*The equality clause requires States to render substantial equality between citizens except where there exist differences justifying the classification of citizens, in which event there must be equality within the classes, and the differences which may justify classification must be such as bear reasonable relation to permissible State objectives sought to be achieved by classification and not such as are merely arbitrary and capricious (US Const, Am 14).*

12. SAME—CONSTRUCTION.

*Provisions of a Constitution must be construed so as to avoid invalidating them whenever it is possible to do so.*

13. SAME—CONSTRUCTION—BOARD OF SUPERVISORS—ELECTION.

*Sections of Constitution relative to membership on county board of supervisors can be construed properly to require the election of members on such boards by city residents as well as by township residents (Const 1963, art 7, §§ 7, 18).*

14. COUNTIES — BOARD OF SUPERVISORS — ELECTION — TOWNSHIPS — CITIES.

*The right to vote for members of the board of supervisors cannot be guaranteed township residents while such guaranteed right is withheld from city residents (US Const, Am 14; Mich Const 1963, art 7, §§ 7, 18).*

15. CONSTITUTIONAL LAW—REPRESENTATIVE GOVERNMENT.

*It is not a representative government in which the people are not permitted to say in what trusts their agents shall represent them, and to vote the taxes they are to pay, or be permitted to choose representatives for the purpose.*

16. SAME—EQUAL PROTECTION—TOWNSHIPS—POPULATION—SUPERVISORS.

*Section of Constitution allocating to each township only 1 supervisor irrespective of population is contrary to the equality*

clause of the *Federal Constitution, and the equality clauses
of the State Constitution being construed as identical, is vio-
lative of State equality clauses as well (US Const, Am 14;
Mich Const 1963, art 1, §§ 1, 2, art 7, § 7).*

17. COUNTIES—SUPERVISORS—REPRESENTATION.
   *Supervisors, in the scheme of local self-government of this State,
   although selected from districts coterminous with township and
   city boundaries, represent the people therein and not the par-
   ticular local units of government from which they come.*

18. COURTS—DEFERRAL OF JUDICIAL REMEDY—BOARD OF SUPERVISORS
   —MUNICIPAL CORPORATIONS—TOWNSHIPS.
   *Judicial remedy for unequal representation of cities and town-
   ships on county board of supervisors is deferred until the end
   of the 1967 legislative session, with jurisdiction retained until
   the further order of the Supreme Court (US Const, Am 14;
   Mich Const 1963, art 1, §§ 1, 2; art 7, § 7).*

19. COSTS—PUBLIC QUESTION—COUNTY BOARD OF SUPERVISORS.
   *No costs are allowed in suit to declare void constitutional and
   statutory provisions relative to composition of county board of
   supervisors, a public question being involved (US Const, Am
   14; Mich Const 1963, art 1, §§ 1, 2; art 7, §§ 7, 18; CLS
   1963, § 117.27).*

SEPARATE OPINION FOR REVERSAL.

BLACK, J.

20. QUO WARRANTO—COUNTY BOARD OF SUPERVISORS—APPORTION-
   MENT—JURISDICTION.
   *Jurisdiction of quo warranto proceeding in which it is claimed
   that county board of supervisors was malapportioned is ordered
   retained pending determination that 1-man 1-vote principle
   applies or does not apply to the organization of county govern-
   ment in the State by the Supreme Court of the United States;
   reversal being presently voted, thereby effecting an affirmance
   by an equally divided court.*

SEPARATE OPINION FOR REVERSAL.

DETHMERS and O'HARA, JJ.

21. CONSTITUTIONAL LAW—EQUAL PROTECTION—CONSTRUCTION BY
   ANALOGY.
   *The judicial construction of the equality clause to require that
   both houses of a bicameral legislature be elected on a 1-man*

1-vote principle may not be extended by analogy to strike down a constitutional provision of a State Constitution adopted by the citizens of a sovereign State until so required by the Supreme Court of the United States (US Const, Am 14; Mich Const 1963, art 7, § 7).

22. Counties—Board of Supervisors.

Other factors than population may be considered in the election of representatives to local legislative bodies of local government, such as county boards of supervisors.

23. Judges—Function.

A judge is elected to interpret the Constitution, not to advocate political theories.

24. Counties—Municipal Corporations—Board of Supervisors— Initiative—Referendum—Legislature.

Unfairness or injustice in county-city relationships on boards of supervisors may be rectified through action of the legislature or operation of the powers of initiative and referendum or both if citizens see fit to take such action, where the present system has not been declared illegal by any controlling judicial precedent.

25. Costs—County Board of Supervisors.

No costs are allowed in action to declare void constitutional and statutory provisions relative to composition of county board of supervisors, where judgment of invalidity is reversed and complaint ordered dismissed.

Separate Opinion for Reversal.

Kelly, J.

26. Quo Warranto—County Board of Supervisors—Apportionment —Equal Protection.

Judgment in quo warranto proceeding that county board of supervisors was malapportioned is ordered reversed and complaint dismissed, where the board is not apportioned in violation of the equality clauses of the Federal and State Constitutions (US Const, Am 14; Mich Const 1963, art 1, §§ 1, 2).

See headnote 25.

Appeal from Kent; Searl (Fred N.), J. Submitted November 3, 1965. (Calendar No. 13, Docket No. 51,122.) Decided April 5 and 6, 1966.

Complaint by Tony Brouwer, Robert J. Clarke, Lewis Clingman, Henry Ippel, and Peter Oppewall, registered voters in the city of Grand Rapids, against Jack Bronkema, Charles Lawyer, Eugene Edgecomb, Louis F. Battjes, R. Stanton Kilpatrick, Howard Nyenhuis, Laura E. Shepard, Harry E. Zuck, Howard F. Roberts, and Edward Van Solkema, respectively county clerk of Kent county, chairman of Kent county board of supervisors, and city clerks of various cities, to declare void constitutional and statutory provisions relative to the composition of the county board of supervisors, and for attendant injunctive relief. Judgment for plaintiffs. Defendants appeal. Affirmed by an equally divided court, but with jurisdiction retained by the Supreme Court.

*Marcus, McCroskey, Libner, Reamon, Williams & Dilley* (*William G. Reamon,* of counsel), for plaintiffs.

*Vander Veen, Freihofer & Cook* (*George R. Cook,* of counsel), for defendants Bronkema, Kent county clerk, and Lawyer, chairman of board of supervisors.

*Schmidt, Smith, Howlett & Halliday* (*Richard L. Spindle,* of counsel), for defendant Van Solkema, Wyoming city clerk.

*Law, Fallon, Weathers & Richardson* (*Robert W. Richardson,* of counsel), for defendant Battjes, East Grand Rapids city clerk.

*Varnum, Riddering, Wierengo & Christenson* (*John L. Wierengo, Jr.,* of counsel), for defendant Roberts, Walker city clerk.

*Bergstrom, Slykhouse & Van Orden (Richard Van Orden,* of counsel), for defendants Nyenhuis, Grand-ville city clerk, and Zuck, Rockford city clerk.

Souris, J. *(for affirmance).*

This is an appeal from a decision of the circuit court for Kent county that the apportionment of seats in the Kent county board of supervisors violates the equality clause of the Fourteenth Amendment to the Federal Constitution.

## I

On June 23, 1964, barely one week after announcement by the United States Supreme Court of its decisions in *Reynolds* v. *Sims,* 377 US 533 (84 S Ct 1362, 12 L ed 2d 506), and five related cases,[1] plaintiffs, registered voters in the city of Grand Rapids, Kent county filed a complaint in the circuit court challenging the apportionment of representation on the Kent county board of supervisors, the county's legislative body. Defendants were the county clerk, the chairman of the board of supervisors, and the city clerks of each of Kent county's eight cities. The complaint alleged a deprivation of rights under the equality clauses of the Michigan Constitution[2] and the Fourteenth Amendment to the Federal Constitution.

The complaint stated that the Kent county board of supervisors was composed of 73 members. It also set forth the following relevant State constitu-

---

[1] *WMCA, Inc.,* v. *Lomenzo, Secretary of State,* 377 US 633 (84 S Ct 1418, 12 L ed 2d 568); *Maryland Committee for Fair Representation* v. *Tawes, Governor,* 377 US 656 (84 S Ct 1429, 12 L ed 2d 595); *Davis* v. *Mann,* 377 US 678 (84 S Ct 1441, 12 L ed 2d 609); *Roman* v. *Sincock,* 377 US 695 (84 S Ct 1449, 12 L ed 2d 620); and *Lucas* v. *Forty-Fourth General Assembly of Colorado,* 377 US 713 (84 S Ct 1459, 12 L ed 2d 632).

[2] Const 1963, art 1, §§ 1 and 2.

tional and statutory provisions by which representation on the board of supervisors is apportioned:

"A board of supervisors shall be established in each organized county consisting of one member from each organized township and such representation from cities as provided by law."   Const 1963, art 7, § 7.

"Sec. 27.  Any city now organized or which may hereafter be organized, may, by its charter, to be adopted or amended in accordance with the provisions of this act, provide for the selection by appointment or election of representatives on the board of supervisors of the county; the number of such representatives on said board of supervisors shall be determined by the population of such cities as shown by the last census, regular or special, taken by the United States, or by the State as herein provided, as follows: Cities having less than 750 population shall have 1 representative on the board of supervisors of the county; cities having at least 750 and not more than 3,000 population shall have 2 such representatives; cities having over 3,000 and not more than 4,000 population shall have 3 such representatives; cities having over 4,000 and not more than 9,000 population shall have 4 such representatives; cities having 9,000 and not more than 25,000 population shall have 5 such representatives; cities having over 25,000 and not more than 35,000 population shall have 6 such representatives; cities having over 35,000 and not more than 49,000 population shall have 7 such representatives; cities having over 49,000 and not more than 65,000 population shall have 8 such representatives; cities having over 65,000 and not more than 80,000 population shall have 10 such representatives; cities having over 80,000 and not more than 100,000 population shall have 12 such representatives; and cities having over 100,000 and not more than 500,000 population shall be entitled to 1 additional representative for each additional 10,000 population or fraction thereof and

cities having 500,000 or more population shall be entitled to 1 additional representative for each additional 40,000 population or fraction thereof which such city may have. In counties having a population in excess of 2,000,000, whose cities shall now have or hereafter be entitled to a total representation upon their board of supervisors of 75 or more representatives under the aforesaid provisions of this section, the number of representatives of cities on the board of supervisors in such counties on and after the Tuesday following the second Monday in April in the year 1961 shall be as follows: Cities having less than 25,000 population shall have 1 representative on the board of supervisors of the county; cities having over 25,000 and not more than 40,000 population shall have 2 representatives; cities having over 40,000 and not more than 70,000 population shall have 3 representatives; cities having over 70,000 population shall be entitled to 1 additional representative for each additional 30,000 population or major fraction thereof which such city may have. In any such county where any city shall have a population of 53% or more of the total population of the county but less than 51% of the total representation on the board of supervisors, the representation of such city on the board of supervisors shall be increased automatically so that it will have as near as may be, but not less than 53% of the total representation on such board, and whenever the representation of the balance of the county is thereafter increased or decreased, the representation of such city shall be increased or decreased automatically so that it will have as near as may be, but not less than 53% of the total representation on such board, and whenever the population of such city decreases to less than 53% of the population of the county, this provision shall not apply, but representation of such city shall be determined as provided above for other cities in the same population class: Provided further, That in each city entitled to additional representatives where the city

charter does not provide for the selection of such additional representatives, the additional representatives shall be selected by the governing body of the city. In counties having a population of less than 1,000,000 but more than 500,000, cities having a population of 7,500 or less shall have 1 representative on the board of supervisors, cities having a population of 7,501 and less than 15,000 shall have 2 representatives, cities having a population of 15,001 and less than 22,500 shall have 3 representatives, cities having a population of 22,501 and less than 32,500 shall have 4 representatives, cities having a population of 32,501 but not more than 50,000 shall have 5 representatives, cities having a population of 50,001 but less than 75,000 shall have 6 representatives, cities having over 75,000 shall have 1 additional representative for each additional 25,000 population or fraction thereof: Provided further, That on and after the Tuesday following the second Monday in September, in the year 1955, and until the charters of cities in such counties are revised or changed to designate the representatives and representation on such board of supervisors, such cities shall be represented on the board of supervisors by the city officials and others as provided in existing city charters, in the order named therein, until the total number to which each city is entitled under the provisions herein is filled; and if the number of representatives to which such cities are entitled does not include all of the members of any council, commission or class designated in the city charter, the number of such council, commission or class entitled to be representatives on the board of supervisors under the provisions herein shall be selected in the order of the largest popular vote received by each at the election to such council, commission or class: Provided, That wherever the representation of cities upon the board of supervisors of the county has been fixed by law it shall remain as now fixed until changed by charter provision, and no city shall have power to increase its repre-

sentation on such board of supervisors beyond the number provided for in this section, nor shall the representation of any city on the board of supervisors be decreased by revision of its charter unless so expressly provided for in such revised charter, except that any city may provide in its charter for a number of representatives on the board of supervisors to a number equal to the representation of any city of less population in the county: Provided further, That in counties containing only 1 city, where at the present time the representation of the city on such board is exactly equal to the representation of the balance of the county, such city shall not have power, under this section, to increase its representation so that it will exceed the representation of the balance of the county: Provided further, That when any city lies in more than 1 county, said city shall be entitled to be represented on the board of supervisors of each such county by a number of supervisors determined by the population of said city lying within each such county in accordance with this section, except that in no case if the population of said city lying in one of said counties be less than 750 persons, shall said city be represented by more than 1 supervisor on the board of supervisors of that county: Provided further, That any incorporated city may, for the purpose of showing its population for the purposes of this section, have conducted an enumeration under the supervision of the secretary of State as provided for in section 6 hereof whenever the legislative body of such city shall by resolution order such enumeration. A resolution ordering such enumeration may be submitted by initiatory petition in the same manner and with like effect as is or may be provided by law for the proposal and submission of amendments to the charter of any such city." CLS 1961, § 117.27 (Stat Ann 1963 Cum Supp § 5.2106).

Also pertinent, but not quoted in the complaint, is the following constitutional provision:

"In each organized township there shall be elected for terms of not less than two nor more than four years as prescribed by law a supervisor, a clerk, a treasurer, and not to exceed four trustees, whose legislative and administrative powers and duties shall be proveded by law."    Const 1963, art 7, § 18.

Plaintiffs alleged that whereas article 7, § 7 of the Constitution of 1963 provides for one supervisor from each organized township regardless of population, the legislature, by the quoted statute, granted cities the right to determine by charter provision whether supervisors from each city would be appointed, and by whom, or would be elected by the people, and the same statute specified the number of supervisors to which each city would be entitled based upon population ranges which discriminate against cities the larger they become.    They asserted that the apportionment of township supervisors is based solely upon geography, an impermissible basis under both the State and the Federal equality clauses; that plaintiffs are denied equal representation in the board of supervisors, in violation of both the State and the Federal equality clauses, each of their 24 supervisors from the city of Grand Rapids representing 8,429 residents while each of two supervisors from the city of Cedar Springs represents only 975 residents and one supervisor from Vergennes township represents only 945 residents,[3] the

[3] The following chart, of Kent county's cities and townships, the number of supervisors representing each on the board of supervisors, their 1960 census population and the number of residents represented by each supervisor, appears in the trial court's opinion:

| City or Township | Number of Supervisors | Population | Population Per Supervisor |
|---|---|---|---|
| Cedar Springs City | 2 | 1,850 | 925 |
| Vergennes Twp. | 1 | 945 | 945 |
| Spencer Twp. | 1 | 1,014 | 1,014 |
| Rockford City | 2 | 2,074 | 1,037 |
| Bowne Twp. | 1 | 1,181 | 1,181 |
| Lowell City | 2 | 2,545 | 1,272 |
| Grattan Twp. | 1 | 1,346 | 1,346 |

average ratio of population per supervisor in the county being 4,975 to 1;[4] and that the city of Grand Rapids, with approximately 60% of the county's population, has only 24 supervisors, less than one-third of the total membership of the county's 73-member board of supervisors, whereas, if its residents were accorded equality of representation in compliance with State and Federal constitutional requirements, it would be entitled to 41 supervisors.

Plaintiffs requested the trial court to declare that article 7, § 7 of the Constitution of 1963 violates the equality clause of the Fourteenth Amendment to the United States Constitution; to declare that CLS 1961, § 117.27 (Stat Ann 1963 Cum Supp

| City or Township | Number of Supervisors | Population | Population Per Supervisor |
|---|---|---|---|
| Oakfield Twp. | 1 | 1,471 | 1,471 |
| Courtland Twp. | 1 | 1,555 | 1,555 |
| Lowell Twp. | 1 | 1,567 | 1,567 |
| Grandville City | 4 | 7,975 | 1,994 |
| East Grand Rapids City | 5 | 10,924 | 2,185 |
| Tyrone Twp. | 1 | 2,388 | 2,388 |
| Solon Twp. | 1 | 2,422 | 2,422 |
| Nelson Twp | 1 | 2,455 | 2,455 |
| Algoma Twp. | 1 | 2,485 | 2,485 |
| Walker City | 4 | 10,000 | 2,500 |
| Caledonia Twp. | 1 | 2,752 | 2,752 |
| Cannon Twp. | 1 | 2,825 | 2,825 |
| Ada Twp. | 1 | 2,887 | 2,887 |
| Cascade Twp. | 1 | 3,333 | 3,333 |
| Alpine Twp. | 1 | 4,764 | 4,764 |
| Sparta Twp. | 1 | 5,247 | 5,247 |
| Wyoming City | 8 | 45,829 | 5,728 |
| Byron Twp. | 1 | 6,036 | 6,036 |
| Gaines Twp. | 1 | 6,120 | 6,120 |
| Grand Rapids Twp. | 1 | 6,738 | 6,738 |
| Grand Rapids City | 24 | 202,296 | 8,429 |
| Paris Twp. | 1 | 14,000 | 14,000 |
| Plainfield Twp. | 1 | 15,000 | 15,000 |
| | 73 | 372,024 | |

[4] The ratio of 4975 to 1 is obtained by dividing the 1960 official census population of Kent county, 363,187 by 73. It will be observed in note 3 that the population figures for the city of Walker, incorporated in 1962, and the townships of Paris and Plainfield are estimates. Were the figure 372,024 to be divided by 73, the average per supervisor would be 5096.—REPORTER.

§ 5.2106), violates not only the Fourteenth Amendment but, as well, our own Constitution's equality clauses, article 1, §§ 1 and 2, Constitution of 1963; to enjoin the defendant county and city clerks from conducting any elections for county supervisors, under the assertedly unconstitutional apportionment plan, and from certifying or accepting the certification of any members of the board of supervisors elected pursuant thereto; and to enjoin defendant chairman of the board of supervisors from convening and conducting any meeting of said board.

In due course the defendants filed answers to the plaintiffs' complaint and the parties entered into a stipulation of facts which ultimately was the factual basis for the circuit judge's judgment in this cause. The following description of the allocation of membership on the Kent county board of supervisors, and the manner in which its members are selected, is taken from the parties' stipulation:

"(a) All supervisors of individual townships are elected by the registered voters in said townships, as provided by article 7, § 18, Constitution of 1963.

"(b) The 24 members from the city of Grand Rapids, include 7 elected members of the city commission, 12 supervisors, 4 elected from each of the three wards, and 5 appointed city officials, the city treasurer, city comptroller, city assessor, city manager, and city attorney, as provided by title 5, § 25, of the charter of the city of Grand Rapids.

"(c) The 2 members from the city of Cedar Springs are selected under the provisions of section 3.19 of the city charter the relevant portion reading as follows:

" 'The representative of the city on the board of supervisors shall be appointed by the council for a period of two years. Such appointment shall be made at the first regular council meeting following each election. Any such representative may be re-

moved at the will of the council. Such representative shall meet all requirements of section 5.1 at the time of their appointment and may hold their elective or appointive city office or employment. In case any representative of the city on the board of supervisors shall be unable to perform the duties of his office for any reason, the council may appoint another qualified person to serve temporarily in his stead.'

"(d) The 5 members from the city of East Grand Rapids are selected in accordance with the provisions of chapter 5, § 4(e), of the city charter, the relevant portion reading as follows:

" '(e) Two or more supervisors who shall be the city's representatives on the board of supervisors of Kent county. It shall be the duty of the commission to appoint one or more members of the commission as supervisors. Their duties shall be such as are prescribed by the laws of the State governing supervisors. The commission shall from time to time appoint such additional supervisors as the city is entitled to under the general laws of the State.'

"(e) The 4 members from the city of Grandville are selected in accordance with the provisions of chapter 16, § 16.2, of the city charter, the relevant portion reading as follows:

" 'The representatives of the city on the board of supervisors shall be appointed by the council for an indefinite period and may be removed at the will of the council. Such representatives shall meet all requirements of section 5.1 at the time of their appointment and may hold other elective or appointive office or employment. In case any representative of the city on the board of supervisors shall be unable to perform the duties of his office for any reason, the council may appoint another qualified person to serve temporarily in his stead.'

"(f) The 2 members from the city of Lowell are selected in accordance with the provisions of chapter 14, § 14.2 of the city charter, the relevant portion reading as follows:

" 'One representative of the city on the county board of supervisors shall be appointed by the council at its first regular meeting in each December for a two-year term, which term shall commence on the 1st day of January following his appointment; except that initially all supervisors shall be appointed by the council at the same time, one supervisor for a term ending December 31, 1960, and the other for a term ending December 31, 1961. Such representatives shall meet all requirements of section 4.4 at the time of their appointment and may hold other elective or appointive city office or employment. In case any representative of the city on the board of supervisors shall be unable to perform the duties of his office for any reason, the council may appoint another qualified person to serve temporarily in his stead.'

"(g) The 2 members from the city of Rockford are selected in accordance with the provisions of chapter 15 of the city charter, the relevant portion reading as follows:

" 'Such representative as the city may be allowed by State law on the Kent county board of supervisors shall be appointed by the council, except that the mayor shall be one such representative as long as the State law may so require. Any elective or appointive officials of the city or any citizen may be appointed to such office or offices and shall hold office at the pleasure of the council. If any representative of the city on the county board shall be unable to attend any meeting of the board because of absence or disability, the council may appoint some other qualified person to discharge the duties of the office during such absence or disability.'

"(h) The 4 members from the city of Walker are selected in accordance with the provisions of chapter 5, § 5.2, of the city charter, the relevant portion reading as follows:

" 'The representatives of the city of Walker on the board of supervisors of Kent county shall be the mayor of the city of Walker who shall be super-

visor ex officio, one supervisor appointed by the city commission from among the members of the city commission or the elected or administrative offices of the city and two supervisors elected from the city at large. The mayor and the supervisors appointed as aforesaid by the city commission shall serve on the board of supervisors for a term of two years; the two supervisors elected from the city at large shall serve for a term of 4 years.'

"(i) The 8 members from the city of Wyoming are selected in accordance with the provisions of chapter 15, §§ 15.2 and 15.3, the relevant portion reading as follows:

" 'Section 15.2. The representatives of the city on the board of supervisors shall be appointed by the commission for an indefinite period and may be removed at the will of the commission. Such representatives shall meet all requirements of section 5.1 at the time of their appointment and may hold other elective or appointive city office or employment. In case any representative of the city on the board of supervisors shall be unable to perform the duties of his office for reasons of physical disability, the commission may appoint another qualified person to serve temporarily in his stead.'

" 'Section 15.3. Except as otherwise provided in this charter, the representatives of the city on the board of supervisors shall perform the statutory duties of supervisors. In the performance of his duties each supervisor shall represent the city, its inhabitants and its government to the best of his ability.' "

Circuit Judge Searl, the trial judge, summarized the parties' legal contentions before him in his excellent opinion. His summary follows:

"Plaintiffs, pointing out the variation in the per capita representation per supervisor in the townships and cities, contend: that the board of supervisors is the legislative body of the county of Kent,

exercising legislative powers delegated to it by the State of Michigan; that the equal protection clause of the Fourteenth Amendment of the Constitution of the United States is applicable to the State and all governmental agencies and instrumentalities thereof, including the county board of supervisors; that the equal protection clause as construed by the United States Supreme Court in *Reynolds* v. *Sims* and companion cases requires that the seats in the State legislature be apportioned on a population basis and that this clause, as so construed, is applicable to the board of supervisors to which the State has delegated a part of its legislative powers; that the State may not delegate its legislative powers to the county board of supervisors and then apportion representation on that board on other than a population basis.

"And plaintiffs conclude that the present apportionment of the board of supervisors which is not on a population basis, violates the equal protection clause of both the Fourteenth Amendment and of the State Constitution, summarizing in their brief their position as follows:

" 'that the shocking imbalance of representation between township and city, and between townships themselves, is a political anachronism at this time when the courts throughout the United States are hastening to the recognition and protection of constitutionally guaranteed rights of equal protection in all realms of political organization.  Continued malapportionment of governing political bodies, at any level, is an indefensible infringement upon the rights of the citizenry no less when it is exercised at the county level than when it is exercised at the State or national levels.'

"The contentions of the defendants may be summarized from their briefs and oral arguments as follows: that the equal protection clause, as interpreted in *Reynolds* v. *Sims,* is limited in its application to the State legislature and is not applicable to the county board of supervisors; that the board

of supervisors is primarily an administrative and
not a legislative body; that the Kent county board
of supervisors is not an elected body and the plain-
tiffs have no right to vote for its members, which
is the subject of protection by the United States
Constitution; and that the State Constitution of
1963 was not intended to affect county government
as it had existed in Michigan since 1842.

"And counsel for defendants conclude their briefs
with this summary of their arguments:

" 'Plaintiffs, of course, have a fundamental right
to participate in the election of State legislators.
But they do not have a fundamental right to partici-
pate in the election of members of the board of su-
pervisors.   That right, to the extent that it now
exists, can be taken completely away from plaintiffs
by action of the State legislature.   Alternatively,
the State legislature can "provide by law" that all
members of the board of supervisors from cities
shall be nonelected persons.   What this means is
simply this:—the only voting right of plaintiffs
which is involved in the present case and with re-
spect to which plaintiffs can claim constitutional
protection is the right to vote for members of the
State legislature.   So long as plaintiffs have an
equal voice with others in the election of members
of the State legislature they have that full and effec-
tive participation in State government (which in-
cludes county government) which Chief Justice
Warren in *Reynolds* said is their inalienable right.
No other right is here involved.   With respect to it,
plaintiffs already have "equal protection", by virtue
of *Reynolds*.' "

In his opinion, filed September 11, 1964, Judge
Scarl held "that the equal protection clause of the
Fourteenth Amendment requires that the county
board of supervisors meet the same 'basic constitu-
tional standard' [*Reynolds* v. *Sims, supra,* p 568]
as required of the State legislatures, namely, that
it be apportioned on a population basis"; that as

the result of allocating membership on the county board of supervisors in compliance with the requirements of Michigan's Constitution and statutes, "population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body" (*Reynolds* v. *Sims, supra,* p 581); and that, therefore, such State constitutional and statutory provisions are invalid because in conflict with the Constitution of the United States. Judge Searl's judgment deferred remedial judicial action to permit the State legislature during its 1965 session to remedy the deviations from Federal constitutional standards by legislative action and reserved jurisdiction to provide plaintiffs judicial relief in the event the legislature failed to act during 1965. In November of 1964, we granted defendants' application for leave to appeal Judge Searl's decision to this Court.

Defendants' contentions on appeal are that the equality clause of the Fourteenth Amendment does not compel a State to apportion its county boards of supervisors on a population basis nor is it permissible to read the equality clauses of Michigan's Constitution of 1963 to mean that such boards must be so apportioned. In support of their Fourteenth Amendment argument, defendants contend that the language of the United States Supreme Court's controlling opinion in *Reynolds* v. *Sims* expressly limits the Court's decision to mean that the Fourteenth Amendment's equality clause requires equal representation in State legislatures only and that, aside from the limitations expressed by the Supreme Court in *Reynolds* v. *Sims,* the fact that county boards of supervisors in Michigan function not only as local legislative bodies but, as well, as administrative and judicial bodies and the fact that their membership is only partially elective, so distinguish such boards from State legislatures that the con-

stitutional principles which led the United States Supreme Court to find in the Federal equality clause a requirement of equal representation in State legislatures are not applicable to county boards of supervisors.

## II

In *Reynolds* v. *Sims,* the United States Supreme Court concluded that the equal protection clause of the Fourteenth Amendment "requires that the seats in both houses of a bicameral State legislature must be apportioned on a population basis." 377 US 533, 568. Of course the language of the amendment is not so explicit, but the Supreme Court reached its conclusion by applying the "well developed and familiar" (*Baker* v. *Carr* [1962], 369 US 186, 226 [82 S Ct 691, 7 L ed 2d 663]) judicial standards of the equality clause to the process of apportioning legislative power in a representative government where every citizen enjoys the "constitutionally protected right to vote" for State legislators. Section 2, Fourteenth Amendment.[5] The standards applied are not unique to cases asserting rights of equality of representation in legislative bodies or of equality of suffrage. They are the same standards which always are applied in all cases in which the claim is made that a State has denied one of its citizens, or some of its citizens, the equal protection of the

[5] "Section 2. Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

laws. In *Reynolds* v. *Sims* the rights claimed to have been abridged were the right to equal representation in a State legislature and the right to vote for State legislators. Both rights were regarded as of primary importance in a democratic society. It was said in *Reynolds,* pp 560, 561, that *Wesberry* v. *Sanders* (1964), 376 US 1, (84 S Ct 526, 11 L ed 2d 481), "clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." It was said also in *Reynolds,* p 562, that "since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."

As broadly stated as are the principles enunciated by the Supreme Court in *Reynolds,* the Court carefully limited its holding, p 568, to no more than that "the equal protection clause requires that the seats in both houses of a bicameral State legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for State legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." It is not quite accurate to conclude, as did the trial judge in *Seaman* v. *Fedourich* (1965), 45 Misc 2d 940 (258 NYS2d 152), that *Reynolds* v. *Sims* and its companion cases stand for the proposition that the equality clause requires apportionment on an equal population basis of all elected legislative bodies, even those of subordinate political subdivisions of a State. See, also, *Bianchi* v. *Griffing* (1965), 238 F Supp 997, appeal dismissed for want of jurisdiction, 382 US 15 (86 S Ct 52, 15 L ed 2d

11); *Goldstein* v. *Rockefeller* (1965), 45 Misc 2d 778 (257 NYS2d 994); and *Ellis* v. *Mayor and City Council of Baltimore* (CA 4, 1965), 352 F2d 123. If the equality clause so requires, the United States Supreme Court has yet to say so and, thus, something more is required of courts like ours presented with such questions for decision than simple reference to *Reynolds*.[6]

While the United States Supreme Court in *Reynolds,* and other Federal and State courts, including our own, in other State legislative apportionment cases, were dealing with alleged impairments of the "constitutionally protected right to vote" for State legislators and the fundamental principle of equal representation in State legislatures, the claim is made in this case that similar rights, differing only in degree, likewise are impaired in violation of the equal protection clause. In short, it is claimed that the resident of Grand Rapids is not represented equally in the legislative councils of Kent county with the residents of less populated cities, villages, and townships and that the Grand Rapids resident is not even accorded the same right granted township residents of voting for all of his representatives, relatively few though they may be, on the county's legislative board.

As helpful to our task as the Supreme Court's *Reynolds* opinion is in its statement of general principles, there are claimed to be differences between *Reynolds* and this case of Brouwer in the nature of the rights asserted, and not just in degree, which it is claimed preclude our applying the principles of *Reynolds* v. *Sims*. Thus, while the Supreme

---

[6] For a careful analysis of the applicability of the equality clause to elected legislative bodies of subordinate subdivisions of government, see Mr. Justice Hallows' opinion for the supreme court of Wisconsin in *State, ex rel. Sonneborn,* v. *Sylvester* (1965), 26 Wis 2d 43 (132 NW2d 249).

Court found a "constitutionally protected right to vote" for State legislators in section 2 of the Fourteenth Amendment and planted its decision in *Reynolds,* at least in part, upon that protected right, that section's language does not recognize an equivalent Federal right to vote for the legislative officers of a county, or city, or township. Furthermore, *Reynolds* clearly involved a citizen's rights at a level of government no one could dispute was required to be representative in character whereas here we are concerned with a subordinate political subdivision of a State the representative character of which is not beyond dispute. In due course we shall examine these asserted differences in determining whether the principles of *Reynolds* properly can be applied to the claims made in this appeal.

One other preliminary consideration should be stated. Whether the Federal judiciary, concerned as it must be with its delicate relationships to the States, should entertain such claims which relate to the internal operations of State government, we need not decide, for decision of that question does not measure our duty. The claim is made to this State Court and is planted squarely upon the equal protection clause which we are sworn to uphold and apply whenever and however equality is denied by the State.

Like my Brother O'HARA, *infra,* I do not believe the problem before us is so simple that a judicially valid answer can be given by direct analogy to *Reynolds* v. *Sims.* As I have tried to make clear immediately above, there are many differences between the apportionment of a State's legislative power in accordance with equality clause requirements, with which *Reynolds* v. *Sims* was concerned exclusively, and our task of determining whether the equality clause has any bearing whatever, and

if so what, upon the apportionment of a county's legislative power.

While I agree that the differences are too great to permit reliance upon simple and direct analogy to *Reynolds,* as other courts in the country confronted with this problem have done and as I have attempted to avoid doing, I do not regard it an adequate exercise of the judicial function we were elected to perform simply to sweep the learned circuit judge's opinion aside on the apparent ground that until the United States Supreme Court rules on the issue no State court should consider and decide a legitimate assertion by citizens that their Federal, as well as State, constitutional right to equality has been denied them. We State judges, like our Federal Supreme Court superiors, are sworn to uphold the Federal, as well as the State, Constitution. When constitutional rights are asserted by any of our citizens, before they are rejected out of hand a proud court should at least explain the legal basis for their rejection, if that is to be the decision. Our citizens are entitled to demand no less.

While we cannot in propriety instigate litigation we as judges would like to entertain, neither can we remain true to our judicial oath if we evade, even occasionally, the difficult task of deciding those controverted assertions of novel claims of constitutional magnitude. This is such a case and it is our oath-pledged task to decide it by applying diligently whatever professional skill we possess. We cannot pass to another player, difficult though the immediate process of judgment may be for some of us.

## III

Counties have existed in Michigan since territorial days and have been recognized in all of our Constitu-

tions as a unit of government important to the people in the exercise of their right of local self-government. Beginning with our first Constitution in 1835 and repeated in our Constitutions of 1850, 1908, and 1963, the people of this State guaranteed themselves this right of local self-government by reserving for each county's citizens the right to elect certain of the officials of the county.[7] Since our 1850 Constitution at least, and probably earlier as a matter of immemorial usage, the power to legislate regarding the local affairs of each county has been reposed in a county board of supervisors.[8] The membership of the boards of supervisors, again since at least 1850, has consisted of one supervisor elected from each organized township and such representation from cities as may be provided by law.[9] Thus, while Michigan's Constitutions have guaranteed the residents of its organized townships the right to vote for their local legislative representatives in their county boards of supervisors, it has been held by this Court that city residents have not been guaranteed the same right. *Attorney General* v. *Cogshall* (1895), 107 Mich 181; see, also, *White* v. *Board of Supervisors of Manistee County* (1895), 105 Mich 608, at 612, and *Attorney General, ex rel. Lodge,* v. *Bryan* (1914), 182 Mich 86, 90, 91, quoting dictum from *Attorney General* v. *Preston* (1885), 56 Mich 177. The question suggests itself: May a State's Constitution grant township residents the right to vote for their representatives on their county's legislative body while authorizing the State legislature to deny city residents the right to vote for their representatives on such county legislative body with-

---

[7] Const 1835, art 7, § 4; Const 1850, art 10, § 3; Const 1908, art 8, § 3; Const 1963, art 7, § 4.

[8] Const 1850, art 10, §§ 3, 6, 8–11; Const 1908, art 8, §§ 3, 7–10, 13–15; Const 1963, art 7, §§ 4, 6–10, 12, 14.

[9] Const 1850, art 10, §§ 6, 7; Const 1908, art 8, §§ 7, 18; Const 1963, art 7, §§ 7, 18.

out violating the equal protection clause of the Federal Constitution's Fourteenth Amendment?

We have noted in Part II, above, that *Reynolds* v. *Sims* and the other State legislative apportionment cases contemporaneously decided do not control decision herein. But those cases, together with *Baker* v. *Carr* and *Wesberry* v. *Sanders,* do confirm for some of us our conviction that the "well developed and familiar" (*Baker* v. *Carr*, 369 US 186, at 226) judicial standards of the equality clause are applicable to determine whether a State has discriminatorily denied or diluted a citizen's right to exercise the elective franchise. While they cannot be read properly to mean that the equality clause requires all legislative bodies, at whatever level of government, to be apportioned on the basis of population equality, at the very least they mean that whether judicial relief may be granted on the basis of the equality clause in such cases depends upon assertion and proof of discrimination, invidious discrimination, as defined in such cases as *Gulf, C. & S. F. R. Co.* v. *Ellis* (1897), 165 US 150 (17 S Ct 255, 41 L ed 666); *Metropolitan Casualty Insurance Co.* v. *Brownell* (1935), 294 US 580 (55 S Ct 538, 79 L ed 1070); *Hartford Steam Boiler Inspection & Insurance Co. v. Harrison* (1937), 301 US 459 (57 S Ct 838, 81 L ed 1223); *Skinner* v. *Oklahoma, ex rel. Williamson* (1942), 316 US 535 (62 S Ct 1110, 86 L ed 1655); *Walters* v. *City of St. Louis* (1954), 347 US 231 (74 S Ct 505, 98 L ed 660); *Williamson* v. *Lee Optical of Oklahoma, Inc.* (1955), 348 US 483 (75 S Ct 461, 99 L ed 563); and *McGowan* v. *Maryland* (1961), 366 US 420 (81 S Ct 1101, 1153, 1218, 6 L ed 2d 393). And while in *Reynolds* the United States Supreme Court applied the equality clause to an asserted State deprivation of a "constitutionally protected right to vote" for State legislators (*Rey-*

*nolds* v. *Sims,* at p 561), the equality clause, as our judicial history tells us, is not limited only to the protection of those fundamental rights that are granted by the Federal Constitution or otherwise protected by it; rather, it extends its protective cover to all rights, whether granted by Federal or State Constitutions, congressional or legislative enactments, executive order or otherwise, and against all forms of State action, executive, legislative, or even judicial. *Ex Parte Virginia* (1880), 100 US 339 (25 L ed 676); *Louis K. Liggett Co.* v. *Lee* (1933), 288 US 517 (53 S Ct 481, 77 L ed 929, 85 ALR 699); *Hillsborough Township* v. *Cromwell* (1946), 326 US 620 (66 S Ct 445, 90 L ed 358); *Shelley* v. *Kraemer* (1948), 334 US 1 (68 S Ct 836, 92 L ed 1161, 3 ALR2d 441); *Wheeling Steel Corp.* v. *Glander* (1949), 337 US 562 (69 S Ct 1291, 93 L ed 1544); *Dowd* v. *United States, ex rel. Cook* (1951), 340 US 206 (71 S Ct 262, 95 L ed 215, 19 ALR2d 784); *Barrows* v. *Jackson* (1953), 346 US 249 (73 S Ct 1031, 97 L ed 1586); *Brown* v. *Board of Education of Topeka* (1954), 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180); *Pennsylvania* v. *Board of Directors of City Trusts of the City of Philadelphia* (1957), 353 US 230 (77 S Ct 806, 1 L ed 2d 792); *Morey* v. *Doud* (1957), 354 US 457 (77 S Ct 1344, 1 L ed 2d 1485). To put it another way, as the Supreme Court has:

"The controlling legal principles are plain. The command of the Fourteenth Amendment is that no 'State' shall deny to any person within its jurisdiction the equal protection of the laws. 'A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of

the laws. Whoever, by virtue of public position under a State government * * * denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning.' *Ex Parte Virginia,* 100 US 339, 347 (25 L ed 676, 679). Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, see *Virginia* v. *Rives,* 100 US 313 (25 L ed 667); *Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia,* 353 US 230 (77 S Ct 806, 1 L ed 2d 792); *Shelley* v. *Kraemer,* 334 US 1 (68 S Ct 836, 92 L ed 1161, 3 ALR2d 441), or whatever the guise in which it is taken, see *Derrington* v. *Plummer* (CA 5), 240 F2d 922; *Department of Conservation & Development, Commonwealth of Virginia* v. *Tate* (CA 4), 231 F2d 615." *Cooper* v. *Aaron* (1958), 358 US 1, 16, 17 (78 S Ct 1401, 3 L ed 2d 5, 19).

Chief Justice T. M. Kavanagh, writing in dissent in the first *Scholle Case* (*Scholle* v. *Secretary of State* [1960], 360 Mich 1, 3) referred to and quoted at length from many Federal and State court cases applying the equality clause's judicial standards to a variety of invidious discrimination claims. See particularly pp 26 through 39 of his opinion. It is not necessary to repeat all his references and quotations here. Some, however, bear repeating in order to establish clearly the standards we are required to apply.

For example, in *Southern R. Co.* v. *Greene* (1910), 216 US 400 (30 S Ct 287, 54 L ed 536), the United States Supreme Court stated the requirements of the equality clause this way, at p 412:

"The equal protection of the laws means subjection to equal laws, applying alike to all in the same

situation.   If the plaintiff is a person within the
jurisdiction of the State of Alabama within the mean-
ing of the Fourteenth Amendment, it is entitled to
stand before the law upon equal terms, to enjoy the
same rights as belong to, and to bear the same
burdens as are imposed upon, other persons in a like
situation."

The Supreme Court, quoting from one of its earlier
opinions (*Pembina Consolidated Silver Mining &
Milling Co.* v. *Pennsylvania* [1888], 125 US 181–188
[8 S Ct 737, 31 L ed 650]), continued in *Greene:*

" 'The inhibition of the amendment that no State
shall deprive any person within its jurisdiction of
the equal protection of the laws was designed to
prevent any person or class of persons from being
singled out as a special subject for discriminating
and hostile legislation.' "

Then, at the conclusion of its discussion of equal-
ity standards, the Supreme Court in *Greene,* at p
417, said:

"While reasonable classification is permitted,
without doing violence to the equal protection of the
laws, such classification must be based upon some
real and substantial distinction, bearing a reason-
able and just relation to the things in respect to
which such classification is imposed; and classifica-
tion cannot be arbitrarily made without any sub-
stantial basis.   Arbitrary selection, it has been said,
cannot be justified by calling it classification."

In *Truax* v. *Corrigan* (1921), 257 US 312 (42 S Ct
124, 66 L ed 254, 27 ALR 375), the Supreme Court
said, p 337:

"Classification must be reasonable.   As was said
in *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 US 150, 155
(17 S Ct 255, 41 L ed 666), classification 'must al-
ways rest upon some difference which bears a rea-

sonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis.' As was said in *Magoun* v. *Illinois Trust & Savings Bank,* 170 US 283, 293 (18 S Ct 594, 42 L ed 1037): 'The rule * * * [*i.e.,* of the equality clause] is not a substitute for municipal law; it only prescribes that that law have the attribute of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such, but on persons according to their relations.' "

In *Louisville Gas & Electric Co.* v. *Coleman* (1928), 277 US 32 (48 S Ct 423, 72 L ed 770), the Supreme Court, noting the difficulty of defining the meaning of equal protection, proceeded to do it this way, at pp 37 and 38:

"The equal protection clause, like the due process of law clause, is not susceptible of exact delimitation. No definite rule in respect of either, which automatically will solve the question in specific instances, can be formulated. Certain general principles, however, have been established in the light of which the cases as they arise are to be considered. In the first place, it may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances, *Kentucky R. Tax Cases,* 115 US 321, 337 (6 S Ct 57, 29 L ed 414); *Magoun* v. *Illinois Trust & Savings Bank,* 170 US 283, 293 (18 S Ct 594, 42 L ed 1037), and that it applies to the exercise of all the powers of the State which can affect the individual or his property, including the power of taxation. *County of Santa Clara* v. *Southern P. R. Co.* (CC DCal 1883), 18 F 385, 388–399; *Railroad Tax Cases* (CC DCal, 1882), 13 F 722, 733. It does not, however, forbid classification; and the power of the State to classify for purposes of taxation is of wide range and flexibility, provided always, that the classification 'must be reasonable, not arbitrary, and

must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *F. S. Royster Guano Co.* v. *Virginia,* 253 US 412, 415 (40 S Ct 560, 64 L ed 989); *Air-way Electric Appliance Corp.* v. *Day,* 266 US 71, 85 (45 S Ct 12, 69 L ed 169); *Schlesinger* v. *Wisconsin,* 270 US 230, 240 (46 S Ct 260, 70 L ed 557, 43 ALR 1224). That is to say, *mere* difference is not enough: the attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis.' *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 US 150, 155 (17 S Ct 255, 41 L ed 666). Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision. Compare *Martin* v. *District of Columbia,* 205 US 135, 139 (27 S Ct 440, 51 L ed 743); *Bell's Gap R. Co.* v. *Pennsylvania,* 134 US 232, 237 (10 S Ct 533, 33 L ed 892)."

From the foregoing mature references, we may take the law to be that the equality clause of the Fourteenth Amendment requires the States to render substantial equality between citizens except where there exist differences justifying the classification of citizens, in which event there must be equality within the classes, and that the differences which may justify classification must be such as bear reasonable relation to permissible State objectives sought to be achieved by classification and not such as are merely arbitrary and capricious.

These are the requirements of the equality clause we must apply in considering the validity of Michigan's 1963 Constitution which expressly grants township residents the right to vote for their representatives on county boards of supervisors while leaving it to the legislature to provide for the repre-

sentation of cities on such boards and which express-
ly allocates to the residents of each township, regard-
less of population, one supervisor-representative on
such boards.   Were we to construe those constitu-
tional provisions to authorize the legislature to pro-
vide for a method of selection of such representa-
tives by city residents other than by election, we con-
clude that we would have to declare them void for
violation of the Federal equality clause.   However,
we conclude also that those constitutional provisions
(article 7, §§ 7, 18) can be construed properly to
require  the  election  of  representatives  on  such
boards by city residents as well as by township res-
idents and thereby avoid the manifest invalidity of
any other construction.   It is our clear duty to con-
strue  such  provisions  to  avoid  invalidating  them
whenever it is possible to do so.   *Thoman* v. *City of
Lansing* (1946), 315 Mich 566, 576; *Dullam* v. *Will-
son* (1884), 53 Mich 392 (51 Am Rep 128).   However,
notwithstanding such construction which avoids con-
stitutional invalidity on the ground that a right to
vote cannot be guaranteed township residents while
such guaranteed right is withheld from city resi-
dents, discussed *infra* in Part IV, we conclude, in
Part V, *infra,* that article 7, § 7 must be declared
void because it discriminates invidiously against the
residents of large townships and cities by diluting
the weight accorded their votes in relation to the
weight accorded the votes of the residents of smaller
townships.

## IV

If it be claimed, as it seems to be assumed even by
plaintiffs, that article 7, § 7 (Const 1963), read in
the light of section 18, grants the right to vote for
county supervisors to some residents of a county
while denying such right to others, such discrimina-

tory treatment manifestly would be invidiously discriminatory and void because in conflict with the equality clause's requirements. Were we to accept such construction of the constitutional language, our judicial task could be ended quickly.

Unlike *Scholle, supra,* we would not be concerned with the dilution of voting rights by virtue of a classification of voters into electoral districts of disparate populations. We would not have to weigh the discrimination to determine whether it rises to the level of constitutional concern for it would be, as to city residents, complete. Our concern, therefore, would be directed to determination whether there is any legally permissible basis for a division of the State's people between those who are granted a local elective franchise *because* they reside in townships and those denied such right *because* they do not.

While seeming to agree that that is the meaning of article 7, §§ 7 and 18, defendants have not suggested to us any reason why township residents properly can be accorded such preferential treatment, nor can we discern any. The resident of a township has no greater need, as a practical or philosophical matter, to express his direct voice in the selection of his local legislative representative than the city resident. Each is affected in the same manner by the official actions of the board of supervisors. Each has the same stake in the just exercise of local legislative powers which range from the imposition and allocation of local taxes throughout the county to the determination of salaries to be paid county employees.

Nor is there any basis for belief that the township resident has any greater claim to preservation of our traditional right of local self-government than the city resident. In this State, historically, we have

viewed the right of self-government as worthy of
constitutional protection and, hence, have provided
in our most recent Constitution for retention of the
forms of local government, township, village, city,
and county, we have known and enjoyed from the
beginning of statehood, while expressly providing
for modification of village, city, and county forms
of government, but only upon favorable vote of
the local electorate involved. See article 7, §§ 2, 21,
and 22, Constitution of 1963. Significantly, the leg-
islature is empowered by article 7, § 20, to provide
for the dissolution of township governments when
all their territory is included within the boundaries
of villages, and without vote of the township resi-
dents; notwithstanding this apparently lesser regard
for the township form of government, however, if
the parties' construction of article 7, §§ 7 and 18,
is correct, township residents still are favored when
it comes to the right to vote for county supervisors.

The short of the matter is that there is no rational
basis for granting the right to vote for county super-
visors to township residents without granting the
same right to those residents of the county who do
not reside in townships. The State cannot, even
by its constitutional charter, grant to some but not
all of its citizens, absent some rational basis for the
distinction, a right to vote for county legislative of-
ficers without violating the requirements of the Fed-
eral equality clause. This is so not because there is
a Federal constitutionally protected right of all
citizens to vote for members of county legislative
bodies but, rather, because no rational basis has been
suggested, and we can conceive of none, for the dis-
tinction it is assumed the State has drawn between
some of its citizens to whom it has granted the right
to vote and those from whom it is assumed the right
has been withheld. The "well developed and famil-

iar" judicial standards of the Federal equality clause compel our conclusion that such discrimination would be invidious and, thus, constitutionally impermissible. See the cases cited *supra,* p 642. Thus, article 7, § 7 (Const 1963), qualified as it is by section 18, so construed would have to be held invalid because it would violate the requirements of equality contained in the Fourteenth Amendment.

Fortunately, however, there is another construction which can be placed upon sections 7 and 18 of article 7 which will avoid the Fourteenth Amendment pitfall just considered. As noted, *supra,* we should construe such provisions to avoid invalidity whenever it is possible reasonably to do so.

*People, ex rel. LeRoy,* v. *Hurlbut* (1871), 24 Mich 44, contains our answer to the question which one would ask if one construed sections 7 and 18 of article 7 of the 1963 Constitution to permit the legislature to discriminate by denying the elective franchise to city residents, namely: "Why did the people of this State discriminate against the residents of cities and in favor of township residents by providing that the latter be guaranteed the right to elect their representatives on the board of supervisors and the former not?" The answer is that the people intended no such result.

In the *Hurlbut Case* the question considered was whether article 15, § 14 of the Constitution of 1850, which provided "Judicial officers of cities and villages shall be elected and all other officers shall be elected or appointed at such time and in such manner as the legislature shall direct", authorized the legislature in creating a city board of public works to name in the statute establishing the board the individuals who would serve as its first members. It was argued to the Court (p 51) that the language of article 15, § 14, quoted above, is broad enough

to permit the legislature itself to elect such board
members or to appoint them notwithstanding that
the board was to function principally within the
borders of the city of Detroit.

Justice CHRISTIANCY, with whom on this point all
of the Justices agreed, wrote that the constitutional
language should be read to require that judicial of-
ficers of cities and villages be elected by the electors
of such cities and villages and that all other officers
of such cities and villages "be elected by the elec-
tors thereof, or appointed by such authorities there-
of, at such time and in such manner as the legislature
shall direct". He reached this conclusion not by vir-
tue of the specific words used in the constitutional
provision, but rather as an "inference of intention
which I draw from the provision and the *subject
matters* to which it relates". 24 Mich at p 65. He
explained his reasoning as follows (pp 65, 66):

"By no mere interpretation of the words used
can the power here given be limited to elections by
the electors of the city or village, or the appointment
to any local authority. The words are general and
unlimited in this respect, and the limitation can only
be implied or inferred from the nature of the sub-
ject matter to which they relate; yet in respect to
the election, the inference is very strong and satis-
factory, that it was intended to be only an election
by the electors of the locality. This accords with
the meaning of the term as generally used in the
Constitution, in reference not only to the State at
large, but in reference to the local organization of
counties, towns, and districts; and cities and villages
being local organizations for like governmental pur-
poses, it is difficult, if not impossible, to resist the
conclusion that when this section (article 15, § 14)
of the Constitution declares that 'judicial officers
of cities and villages shall be elected,' an election by
the electors of such localities was intended; as this
was precisely the principle adopted by the Constitu-

tion in reference to all other judicial officers; and there is no reasonable ground for saying that the election of other officers mentioned in the immediate context was to be of a different character. And it may be said with certainty that, wherever, in the Constitution, the election of an officer is provided for, it means an election by the electors of the State, if it be a State officer, or of the district or political division for which he is to be elected, unless the Constitution itself, as to any particular election, provides otherwise."

Further evidence of the importance of elected representatives in any scheme of local government is given by *People, ex rel. Board of Park Commissioners,* v. *Common Council of Detroit* (1873), 28 Mich 228 (15 Am Rep 202). There, the Court had to determine the validity of an act which created for the city of Detroit a board of park commissioners, the members of which ultimately were to be appointed by the mayor with approval of the common council. The board was given unrestricted power to locate a park in the city and to determine, within certain limits, the amount of debt the city should incur in securing the park. Speaking for the Court, Mr. Justice Cooley said (pp 245, 246, 248):

"A representative, as we understand it is one chosen by a principal to exercise for him a power or perform for him a trust. In that sense the mayor of Detroit is a representative for some purposes, the members of the common council for others, and the members of the board of education for still others. But the idea of a representative implies not merely a person chosen for some purpose, but a person chosen for a particular purpose, and confided in to represent his principal therein. One person may be thought suited to one duty, and another to another; and the right to be represented implies a right not merely to name the person, but also to

designate the trust that shall be confided to him. That government would be but a mockery of republican institutions, which, while leaving to the people a choice of officers, should afterwards determine whether any particular officer who had been selected by the people should be a legislator or a judge, a governor or a policeman. * * * It would be difficult to conceive of any action which would more effectually set aside republican government, and deprive the people of their undoubted rights and constitutional liberties, than an act of this nature, which, while it placed no person in power whom the people had not chosen, would nevertheless so pervert the power as to place persons chosen for inferior duties for which they were fit, in the high and responsible positions in municipal government, where the people would refuse to trust them.

"The case supposed is of course extreme and wholly improbable, but sometimes to suppose an extreme case is the best method of demonstrating the danger of false doctrines. What we desire clearly to express is simply this: that that is not a representative government in which the people are not permitted to say in what trusts their agents shall represent them. Nor in saying this do we deny the authority of the legislature to modify the powers and duties of existing local officers. It is not doubted that such a power exists, and its exercise tends greatly to the improvement of local administration in many cases. Indeed, it is a necessary power if valuable changes are to be brought about, and its exercise from time to time must always be considered as possible, and therefore always within the contemplation of the people when their officers are chosen. * * * And while all legislative as well as judicial bodies should be careful not to be overnice or technical in considering the changes proposed or made where the object sought is a *bona fide* improvement in the functions of a representative, so on the other hand is it specially incumbent on all to take care that the mere bodiless shadow of repub-

lican government be not by such a method substituted for the reality, and that while the people are suffered to go through the forms of an election, there shall not rest in some authority at a distance, the power to deprive the election of any valuable significance. \* \* \*

"From the very dawn of our liberties the principle most unquestionable of all has been this: that the people shall vote the taxes they are to pay, or be permitted to choose representatives for the purpose."

It would have been possible to construe article 10, §§ 6 and 7, and article 11, § 1 of our Constitution of 1850, wherein the currently applicable scheme of township and city representation in county boards of supervisors first appeared in constitutional form, and it is possible now to construe article 7, §§ 7 and 18 of the Constitution of 1963, to mean that cities should have such representation in the boards of supervisors of the counties, to be elected by the electorate of the cities, as the legislature may direct. The language of our constitutional provisions, of 1963 as well as of 1850, no more requires that construction than did the language with which Justice CHRISTIANCY was concerned in *Hurlbut* require the construction he gave it. But, applying the principles of *Hurlbut* and *Park Commissioners,* the inference of intention which should be drawn from the cited provisions and the *subject matter* to which they relate, requires the construction suggested. Furthermore, considered in the light of what we have noted the equality clause requires, such construction saves the provisions from Federal constitutional infirmity, at least on the ground we have found fatal to the parties' construction of the language, *supra.* Having provided in article 11, § 1 of the Constitution of 1850 that township residents were entitled to elect a supervisor, the inference is very strong, particularly

in light of the equality clause's requirements, that the same right was intended to be accorded city residents, leaving to the legislature to specify only the number of supervisors to be allocated to cities and the manner of their election.

As a matter of fact, it appears that all supervisors, even those from cities, were elected in this State until near the end of the nineteenth century, at which time city charters began to provide for other modes of selection. Although there is dictum in *Attorney General* v. *Preston* (1885), 56 Mich 177, 180, to the effect that the cited constitutional provisions authorized the legislature to determine the *manner of selection* of supervisors from cities, thereby implying that the legislature could provide for their appointment, the question was not squarely decided until *Attorney General* v. *Cogshall* (1895), 107 Mich 181, when the Court, at 187, held that the cited provisions did not require the election by cities of supervisors. But it should be emphasized that in *Cogshall* the Court did not consider the equality clause's bearing upon its decision. Indeed, in 1895 the currently "well developed and familiar" judicial standards of the equality clause had not yet begun to emerge from the Supreme Court's decisions. The *Cogshall* statement that "the Constitution nowhere requires the election by cities of a supervisor" also should be read in light of the fact that in *Cogshall* the municipality continued to be represented on the board of supervisors by *elected officials:* "In the present case the duties of the supervisors have been in part transferred to an existing board, the members of which have been elected by the electors of the city, and in part to aldermen, who have likewise been elected." 107 Mich 181, 188.

It is perhaps unfortunate that construction of the constitutional language pertinent herein was

not presented to the Court of Cooley, Campbell, Christiancy, and Graves, in which event, considering *Hurlbut* and *Park Commissioners,* it is not unlikely that the language would have been construed to require the election of supervisors not alone by township residents but, as well, by city residents, even without reference to the Federal equality clause. Had such construction been given to the pertinent language of the Constitution of 1850, as we now construe the counterpart language of our Constitution of 1963, local self-government in this State, at least at county level, would have developed far differently than it has, particularly in the period from 1909 to date. Most significantly, perhaps, the people of this State would have enjoyed the privileges and benefits of local self-government, which all of the Justices in *People* v. *Hurlbut* and, two years later, in *Board of Park Commissioners* v. *Common Council of Detroit,* described as of such great importance to our forebears in this State.

The construction we place upon the provisions of our current Constitution, article 7, §§ 7 and 18, by which both city and township residents are guaranteed the right to vote for their representatives on the county boards of supervisors, avoids the invalidity which would attach because of the equality clause to a construction that some but not all citizens were granted the right to vote. Nonetheless, as will be discussed in Part V hereof, we must declare section 7 of article 7 invalid, even as so construed, because of the gross disparities of population existing between various townships and cities within the county of Kent, which disparities result in the dilution of the weight accorded the vote of some township residents as compared with the weight accorded the votes of other residents from smaller townships and cities. See chart at footnote 3, *supra.*

Prudence requires that we note that we are not here concerned with the validity of a State constitutional provision authorizing selection of all county legislative officers other than by election. At the very least validity of such a plan would have to be tested with regard for the possible applicability of the Federal constitutional guarantee to every State of a republican form of government. Article 4, § 4, United States Constitution. And in Michigan, attention would have to be focused also upon our own traditions and historical regard for local self-government so ably expressed by the Justices of the Cooley Court in *People* v. *Hurlbut* and in *Board of Park Commissioners* v. *Common Council of Detroit*. Those Michigan traditions and history are reflected today in article 1, §§ 1 and 23 of our Constitution of 1963 by which we have reaffirmed our conviction that all political power is inherent in the people and have reserved to ourselves all rights not otherwise enumerated in the Constitution.

## V

We come now to the reason article 7, § 7[10] cannot withstand Fourteenth Amendment scrutiny even as construed to require election of county supervisors by city as well as township residents. The reason is that the Constitution expressly limits the representation of township residents by allocating only one supervisor to each township regardless of the population of the township, thereby according greater weight in the councils of the county's legislative body to the residents of the smallest township than is accorded to the residents of other townships and cities with greater populations. Again, there

---

[10] Our decision in this case in no way affects the validity of section 18 of article 7 or the function of the office of *township* supervisor provided for therein.

has been suggested no rational basis whatever for
such discriminatory treatment.  In the case at bar
the 945 residents of Vergennes township are en-
titled to the same representation on the board of
supervisors as are the 15,000 residents of Plainfield
township, each group of township residents being
represented on the board by but one supervisor.
Thus, even as between township residents, there is
lacking that equality the Fourteenth Amendment re-
quires.  Once the right to vote for representatives
to serve on a legislative body is granted, that right
may not be diluted by denying equal representation
to some accorded that right without violating the
equality clause's requirements.  We conclude, there-
fore, that article 7, § 7 is invalid because it requires
every township to be represented on its board of
supervisors by one member and only one regardless
of the population of the township.

   If it be suggested that such apparent discrimina-
tion between large and small townships and cities is
justified because supervisors represent townships
and cities as units of government in the board of
supervisors and not the residents thereof, we would
be compelled to reject the suggestion for the same
reasons we have rejected a like suggestion that
State legislators represent counties in the legisla-
ture.  Our Constitution speaks in terms of repre-
sentation from townships and cities on the boards
of supervisors just as our Constitution of 1908, arti-
cle 5, § 4, spoke in terms of apportioning State repre-
sentatives among the counties.  Yet it cannot be
doubted today that *Baker* v. *Carr* and *Reynolds* v.
*Sims* compel the conclusion that State legislators
represent only people in a government that calls it-
self republican.  By the same reasoning, supervisors
in our State scheme of local self-government, al-
though selected from districts coterminous with

township and city boundaries, represent the people therein and not the particular local units of government from which they come. For a definitive treatment of the nature of our local units of government and their significance to the reserved right of our people to broad powers of local self-government, see *People* v. *Hurlbut* and *Board of Park Commissioners* v. *Common Council of Detroit.*

## VI

While it is our judgment that the Fourteenth Amendment's equality clause requires our affirmance of Judge Searl's judgment, the result we reach is, as well, required by the equality clauses of article 1, §§ 1 and 2 of our own Constitution of 1963. We have previously held that the counterpart provision of those clauses, article 2, § 1, Constitution of 1908, was identical in meaning to the Federal equality clause. *In re Fox's Estate* (1908), 154 Mich 5; *Naudzius* v. *Lahr* (1931), 253 Mich 216 (74 ALR 1189); *Cook Coffee Co.* v. *Village of Flushing* (1934), 267 Mich 131; *Mutchall* v. *City of Kalamazoo* (1948), 323 Mich 215; *Gauthier* v. *Campbell, Wyant & Cannon Foundry Co.* (1960), 360 Mich 510.

Appearing as they do in the Constitution of 1963 together with the provisions of article 7, §§ 7 and 18, we would be obliged to read those constitutional provisions in such fashion as to give meaning to all of them if it were properly possible to do so. See *supra,* p 648. However, regarded against the background of equality required by article 1, §§ 1 and 2, as comprehensive as that provided by the Federal equality clause, the explicit language of article 7, § 7, granting to each township regardless of population one representative, and only one, on its county board of supervisors, cannot be squared with our own equality requirements of article 1

excepting only by the addition of language to the provisions of section 7, as adopted by the people, which the constitutional convention delegates considered and ultimately rejected. See 1 Constitutional Convention Record, pp 942–952. This we decline to do.

## VII

Judge Searl provided in his judgment for the deferral of a judicial remedy in order to permit the legislature to fashion a legislative remedy, by constitutional amendment or otherwise. While the time set aside by Judge Searl for deferring a judicial remedy has expired as a result of these appellate proceedings, we believe that it is the wise exercise of judgment to defer to the legislature until the end of the 1967 legislative session for corrective legislative or constitutional amendatory action. In the event the legislature fails to provide for appropriate corrective relief, plaintiffs may petition this Court upon termination of the 1967 legislative session for entry of a final decree providing for judicial relief in the premises. In the meantime, a decree will be entered by this Court deferring further action herein and retaining jurisdiction of this cause until the further order of this Court.

No costs, a public question being involved.

T. M. Kavanagh, C. J., and Smith and Adams, JJ., concurred with Souris, J.

Black, J. (*for retention of jurisdiction*). As in *Muskegon Prosecuting Attorney, ex rel. Schaub,* v. *Klevering,* 377 Mich 666, I would retain jurisdiction and therefore vote against affirmance or reversal at this time. Reasons appear in my separate opinion of *Muskegon,* 377 Mich 666, 668.

Supplemental Memorandum of Black, J. (April 6, 1966) (*for reversal*). Refer to my supplemental memorandum, *Muskegon Prosecuting Attorney, ex rel. Schaub,* v. *Klevering,* 377 Mich 666, 673. In this case of Brouwer, I vote to reverse.

O'Hara, J. (*for reversal*). While acknowledging the scholarship in the opinion of the able and experienced trial judge and that of my learned Associate, Mr. Justice Souris, I am nonetheless required to record my disagreement therewith.

I reach a contrary conclusion because I proceed from a different premise. That premise is that we have no right, much less a duty, to strike down a constitutional provision adopted by the citizens of a sovereign State by *analogous* application thereto a judicial construction of the equality clause of the Fourteenth Amendment to the Constitution of the United States.

It is conceded by my confrere that no United States Supreme Court decision mandates a one-man one-vote principle in any elective forum other than both houses of a bicameral State legislature. It is true, as Mr. Justice Souris says, that this Court has always construed the State equal protection clause coextensively with that of the Federal Constitution. We ordered the redistricting and reapportionment of our State in compliance with what the United States Supreme Court said the Federal equality clause demands. Thus we satisfied the Federal requirement and our own. Does my Brother suggest that our equality clause is broader in base and greater in demand than that of the Federal Constitution?

The United States Supreme Court expressly limited the mandate of *Reynolds* v. *Sims*[1] to state

---

[1] 377 US 533 (84 S Ct 1362, 12 L ed 2d 506).

legislatures. As of this date at least there is reserved to the States the right to consider other factors in the election of representatives to the legislative bodies of local government. The factors to which I refer were enumerated by Mr. Justice HARLAN in his dissent in *Reynolds, supra,* as follows (pp 622, 623):

"(1) history;

"(2) 'economic or other sorts of group interests';

"(3) area;

"(4) geographical considerations;

"(5) a desire 'to insure effective representation for sparsely settled areas';

"(6) 'availability of access of citizens to their representatives';

"(7) theories of bicameralism (except those approved by the court);

"(8) occupation;

"(9) 'an attempt to balance urban and rural power';

"(10) the preference of a majority of voters in the State."

The business of judicial analogizing can be a dangerous one. In *Reynolds* the Chief Justice of the United States found the Federal senatorial analogy (p 573) "inapposite and irrelevant" and "an after-the-fact rationalization." Thus, it became so without further reason when his opinion prevailed. Mr. Justice SOURIS finds by analogy that a decision affecting only state legislatures applies also to boards of supervisors, without further reason except that:

"The short of the matter is that there is no rational basis for granting the right to vote for county supervisors to township residents without granting the same right to those residents of the county who do not reside in townships."

My distinguished colleague may be right—that is as right as a judicial majority[2] makes him right, but I respectfully disagree. I find in no judicial decision that "the short of it is" that the sovereign States which joined in a federated union were required to impose on every subdivision of their local governments the nose-counting principle of pure democracy which those States themselves so emphatically rejected. Neither do I believe that the Fourteenth Amendment to the Federal Constitution in its historical context even remotely contemplated such requirement.

If the United States Supreme Court says that is what the Fourteenth Amendment means I will yield as I yielded in the apportionment decision of our own State legislature. But I am not going out of my judicial way to find more applications of the rule of *Reynolds* to local government than my federally constitutional superiors have thus far required. Indeed, in light of certain of their recent decisions, I have some trepidation that if I said judicially the Federal equality clause did so require I might well be found to have marched myself forward right out of the judicial parade when the Federal Supreme Court finally chooses to speak on this point.

All of this is not to say that I regard as "fair" or politically "just" the present relationship of city to county representation on boards of supervisors. But I was elected, as I understand it, to interpret the Constitution, not to advocate political theories. I agree with Mr. Justice Stewart in his dissent in *Lucas* v. *Forty-Fourth General Assembly of Colorado,* 377 US 713 (84 S Ct 1459, 12 L ed 2d 632)

---

[2] By reason of Justice Black's subsequent memoranda of April 6, 1966, there is an equal division of the Court in this case (see page 662), and the simultaneously decided case of *Muskegon Prosecuting Attorney, ex rel. Schaub,* v. *Klevering,* 377 Mich 666, 673.—Reporter.

pp 747, 748, that to hold as does Mr. Justice SOURIS in this case:

"[would] mark a long step backward into that unhappy era when a majority of the members of this court[3] were thought by many to have convinced themselves and each other that the demands of the Constitution were to be measured not by what it says, but by their own notions of wise political theory."

Michigan now has a "one-man one-vote" legislature. Its citizens are armed with initiative and referendum.[4] If in the view of its citizens, county-city relationships on boards of supervisors are unfair or unjust, that citizenry and the legislature,[5] either or both, can quickly rectify the unfairness or injustice. At present I cannot find the representation system illegal by any controlling judicial precedent. Until I can so find I do not intend to substitute my notion of "wise political theory" for that which the citizenry of this State freely chose.

I would vacate the judgment of the trial court and remand the cause, with instructions, to dismiss the complaint and award no costs.

DETHMERS, J., concurred with O'HARA, J.

KELLY, J. (*for reversal*). Because the Kent county board of supervisors is not apportioned in violation of the Fourteenth Amendment of the United States Constitution or of article 1, §§ 1 and 2, of the Michigan Constitution of 1963, I concur in Justice O'HARA's conclusion that the judgment of the trial court be vacated and the cause remanded, with instructions to dismiss the complaint and award no costs.

---

[3] Supreme Court of the United States.
[4] See Const 1963, art 2, § 9.—REPORTER.
[5] See Const 1963, art 4.—REPORTER.